717 A.2d 866 (1998)
DISTRICT OF COLUMBIA, et al., Appellants,
v.
JERRY M., et al., Appellees.
No. 96-CV-1408.
District of Columbia Court of Appeals.
Argued February 12, 1998.
Decided September 3, 1998.
*867 Lutz Alexander Prager, Assistant Deputy Corporation Counsel, with whom Jo Anne Robinson, Interim Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellants.
David A. Reiser, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellees.
Before TERRY and SCHWELB, Associate Judges, and BELSON, Senior Judge.
SCHWELB, Associate Judge:
In the Prison Litigation Reform Act of 1995 (PLRA), Pub.L. No. 104-134, 110 Stat. 1321 (1996), Congress amended several different titles of the United States Code in a comprehensive effort to curtail the ability of prisoners to challenge the conditions of their confinement. Section 802 of the PLRA, known as STOP,[1] severely limited the remedies available to plaintiffs in litigation over prison conditions. See Alexander S. v. Boyd, 113 F.3d 1373, 1380 (4th Cir.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 880, 139 L.Ed.2d 869 (1998). Section 803(d) of the PLRA amended the Civil Rights of Institutionalized Persons Act (CRIPA), 42 U.S.C. §§ 1997 et seq., and restricted the recovery of counsel fees brought pursuant to the Civil Rights Attorney's Fees Award Act, 42 U.S.C. *868 § 1988,[2] "by a prisoner who is confined to any jail, prison, or other correctional facility." 42 U.S.C. § 1997e (d).
This appeal presents the question whether the PLRA's limitation of counsel fee awards in prison litigation applies to the claim of an attorney whose clients are confined at a secure institution for adjudicated juvenile delinquents. We answer this question in the affirmative. We also reject the plaintiffs' related constitutional claim.

I.

BACKGROUND
This suit has a long and complex history. In 1985, the plaintiffs, a certified class of juveniles confined in secure juvenile institutions in the District of Columbia, alleged that the District and its agents had subjected them to unconstitutional and otherwise unlawful conditions of confinement and had failed to provide them with adequate care, rehabilitation and treatment. See District of Columbia v. Jerry M., 571 A.2d 178, 180 (D.C.1990) (Jerry M. I). The parties subsequently reached a settlement, which was memorialized in a consent decree entered on July 24, 1986. Id. at 179. Since that date, most of the Jerry M. litigation has focused on the District's alleged failure to comply with various provisions of the consent decree.[3]
Donna L. Wulkan is one of the attorneys of record for the plaintiffs in Jerry M.[4] In District of Columbia v. Jerry M., 580 A.2d 1270 (D.C.1990) (Jerry M. II), we held that services rendered by Ms. Wulkan were "fully compensable" by the District pursuant to 42 U.S.C. § 1988, at least to the extent that her fees were reasonable. Id. at 1272.
In June 1996, Ms. Wulkan submitted a bill for services furnished on behalf of the plaintiff class from April 15, 1996 through June 7, 1996. The District objected to the amount claimed, arguing that because the PLRA had become effective on April 27, 1996, the portion of Ms. Wulkan's fee request which covered the period from that date until June 7, 1996 was subject to the restrictions set forth in Section 803(d). The plaintiffs and Ms. Wulkan opposed the District's motion, contending that the PLRA's amendments to the CRIPA are inapplicable.
In an oral decision delivered on August 27, 1996, the trial judge ruled that Section 803(d) does not apply to juvenile facilities because, in his view, the plaintiffs were not "confined to any jail, prison, or other correctional facility" within the meaning of the Act. On September 11, 1996, the judge ordered the District to pay Ms. Wulkan $2,966.40, the full amount requested by her, for services provided after the effective date of the PLRA. This appeal followed.

II.

LEGAL DISCUSSION

A. The standard of review.

Although the amount of an award of counsel fees is ordinarily committed to the sound discretion of the trial court, see Jerry M. II, supra, 580 A.2d at 1280, the issue before us is one of statutory construction. Accordingly, we review the trial judge's order de novo. See Alexander S., supra, 113 F.3d at 1381; Ashton Gen. Partnership, Inc. v. Federal Data Corp., 682 A.2d 629, 632 (D.C.1996).
Since the trial judge's ruling, the United States Court of Appeals for the Fourth Circuit has squarely decided the principal question in this case in accordance with the position taken by the District. Alexander S., supra, 113 F.3d at 1380-85. The Supreme Court has denied certiorari. ___ U.S. ___, 118 S.Ct. at 880, 139 L.Ed.2d 869. We accord respectful consideration to the interpretation of the PLRA, which is a federal statute, *869 by the only federal appellate court that, to our knowledge, has had occasion to construe the provision here at issue.[5]

B. Statutory background.

Section 803 of the PLRA, as codified in the CRIPA, provides, in pertinent part, as follows:
(d) Attorney's Fees
(1) In any action brought by a prisoner who is confined to any jail, prison, or other correctional facility, in which attorney's fees are authorized under section 1988 of this title, such fees shall not be awarded, except to the extent that ...
42 U.S.C. § 1997e (d)(1) (emphasis added). The statute then enumerates various restrictions on the availability of awards of counsel fees to successful plaintiffs, and it establishes a cap of 150 percent of the hourly rate prescribed by the Criminal Justice Act. 42 U.S.C. § 1997e (d)(1)-(4).
The word "prisoner" is defined in Section 803(h) of the PLRA as follows:
As used in this section, the term "prisoner" means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program.
42 U.S.C. § 1997e (h) (emphasis added).
The words "any jail, prison, or other correctional facility" are not defined in the PLRA.

C. The statutory language.

The plaintiffs acknowledged in the trial court, and concede on appeal, that juveniles who have been adjudicated delinquent are "prisoners" within the meaning of Sections 803(d) and 803(h). This case therefore turns on whether the plaintiffs are "confined to any jail, prison, or other correctional facility" as those terms are used in Section 803(d).
In Alexander S., supra, the court concluded that "the plain meaning of the [quoted] phrase undoubtedly encompasses juvenile detention facilities." 113 F.3d at 1383. In the court's view, the dictionary definitions[6] of *870 the statutory terms were broad enough to support that conclusion,[7] and it was significant that "Congress did not add any language limiting the scope of these words to adult facilities." Id. Noting the expansive meaning of the word "any," the court concluded that the phrase at issue must be construed "to include all jails, prisons, and correctional facilities, including those housing juveniles." Id. (emphasis in original).
From a purely textual perspective, the analysis in Alexander S. is persuasive but perhaps not quite conclusive. Juvenile delinquency proceedings are not simply criminal prosecutions featuring very young defendants. As the Supreme Court explained in Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966),
[t]he theory of the District's Juvenile Court Act, like that of other jurisdictions, is rooted in social welfare philosophy rather than in the corpus juris. Its proceedings are designated as civil rather than criminal.... The objectives are to provide measures of guidance and rehabilitation for the child and protection for society, not to fix criminal responsibility, guilt and punishment.
Id. at 554-55, 86 S.Ct. 1045 (footnote omitted); see also In re L.J., 546 A.2d 429, 437 (D.C.1988). Given the theoretically noncriminal character of juvenile delinquency proceedings,[8] words like "prison" and "jail" and even "correctional facility," which generally refer to crime, punishment, and incarceration, might ordinarily be viewed as relating to something other than juvenile delinquency proceedings, when those proceedings are civil in character and based on the Juvenile Court Act's social welfare focus. Section 803(h) of the PLRA, however, explicitly defines "prisoner" as including "adjudicated delinquent." See 42 U.S.C. § 1997e (h). If a juvenile delinquent falls within the definition of a prisoner, then the use in the PLRA of criminal law terminology like "jail" or "prison" or "correctional facility" cannot automatically exclude juvenile delinquents from coverage.

D. The presumption against redundancy.

According to the plaintiffs, however, the language and structure of the CRIPA, which are said to have been carried over into the PLRA, conclusively establish that the plaintiffs are not confined "to any jail, prison, or other correctional facility" and that Ms. Wulkan's claim therefore is not subject to the counsel fee strictures of the PLRA. The plaintiffs rely on the distinction in the CRIPA between "a jail, prison, or other correctional facility," see 42 U.S.C. § 1997(1)(B)(ii), on the one hand, and a facility "for juveniles," id. § 1997(1)(B)(iv), on the other.[9] *871 They contend that by listing "a jail, prison, or other correctional facility" (subsection ii) separately from "for juveniles" (subsection iv), Congress must have intended to treat the two categories as different and as mutually exclusive. If the phrase "jail, prison, or other correctional facility" in subsection (ii) were to be read to include juvenile facilities, then, say the plaintiffs, subsection (iv) (facilities for juveniles) would be redundant, and its presence in the statute would have no effect. Moreover, the words "jail, prison, or other correctional facility" are also used in Section 803(d) of the PLRA and, according to the plaintiffs, the limited meaning of the phrase in the CRIPA has therefore been carried over to the PLRA's amendments to the CRIPA.
In a related contention, the plaintiffs reiterate that the counsel fee restrictions promulgated in Section 803(d) of the PLRA do not apply to all litigation instituted by prisoners, but only to those actions which have been brought by prisoners who are "confined to any jail, prison, or other correctional facility." (Emphasis added.) If the District's interpretation of the italicized phrase is correct, and if juvenile facilities are included in it, then, say to the plaintiffs, the italicized phrase has no effect, and might just as well have been omitted from the statute.
The plaintiffs' position is not without surface appeal.[10] "Where, as here, we are asked to determine the meaning of, and discern the interaction between, several statutory provisions, we are especially mindful that each provision of the statute should be construed so as to give effect to all of the statute's provisions, not rendering any provision superfluous." District of Columbia v. Morrissey, 668 A.2d 792, 798 (D.C.1995) (citation and internal quotation marks omitted); see also United States v. Menasche, 348 U.S. 528, 538-39, 75 S.Ct. 513, 99 L.Ed. 615 (1955); Veney v. United States, 681 A.2d 428, 433 (D.C.1996) (en banc); Friendship Hosp. for Animals, Inc. v. District of Columbia, 698 A.2d 1003, 1006 (D.C.1997). "[R]edundancy should not be easily attributed to Congress if another interpretation is possible." Wirtz v. Cascade Employer's Ass'n, Inc., 219 F.Supp. 84, 86 (D.D.C.1963).
Moreover, if, as the plaintiffs assert, the phrase "jail, prison, or other correctional facility" implicitly excludes juvenile facilities, and if that phrase has an established meaning within the context of the CRIPA, then that meaning may constitute a statutory definition that would necessarily trump other definitions, even those with closer ties to the dictionary. "When a legislature defines the language it uses, its definition is binding upon the court even though the definition does not coincide with the ordinary meaning of the words." 1A NORMAN J. SINGER, SUTHERLAND ON STATUTES AND STATUTORY CONSTRUCTION § 20.08, at 90 (5th ed.1993).
We conclude for several reasons, however, that the canon of construction on which the plaintiffs rely, while properly a part of the court's interpretive calculus, is not dispositive of the case. We note at the outset that the "so-called canons of construction are not technical rules of law which afford the answer to a problem like this." Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 293, 76 S.Ct. 349, 100 L.Ed. 309 (1956). Canons phrased in English, like Latin maxims, "will only take us so far." Edwards v. United States, 583 A.2d 661, 664 (D.C.1990). The presumption against redundancy, like the rule of ejusdem generis addressed in Edwards, "is only a constructionary crutch and not a judicial ukase in the ascertainment of legislative intention." Id. (citation omitted). "Canons of construction provide some guidance, but cannot anticipate all of the variables which converge in a concrete case." Id.
The limits of the redundancy canon are illustrated in this case. The plaintiffs argue, *872 as we have noted, that as used in the CRIPA, a facility for juvenilesSection 1997(1)(B)(iv)cannot be a "jail, prison, or other correctional facility"Section 1997(1)(B)(ii)because, if it were, subsection (iv) would be redundant. This contention assumes, however, that each of the five subsections was intended to define a separate type of facility, and that no overlap was intended. An analysis of the statute, which we have quoted in relevant part in note 9, supra, reveals that this is an improbable hypothesis. Subsection (iii)a pretrial detention facilityis likely to overlap in many if not most instances with subsection (ii)a jail, prison, or other correctional facility. Subsection (i)a facility for the mentally ill, retarded, etc.likewise overlaps with subsection (v)an institution providing skilled care. A reasonable reading of Section 1997(1)(B) suggests that the drafter's focus was on ensuring that the legislation covered all institutions intended to be included, and not on defining strictly exclusive categories.
Moreover, even if the term "jail, prison, or other correctional facility," as used in the CRIPA, unambiguously excluded facilities for adjudicated delinquentsand it does notit is not at all obvious that this restrictive definition was adopted in the PLRA. The phrase in question appears not only in Section 803 of the PLRA, but also in Sections 807 and 808, which amend 18 U.S.C. § 3626. But prior to the enactment of the PLRA, 18 U.S.C. § 3626 did not contain these words. It is improbable that Congress used the phrase three times in the PLRA, intending to accord the words their ordinary dictionary meaning in Sections 807 and 808, but contemplating a limited and compressed meaning in Section 803.
Finally, the redundancy canon on which the plaintiffs have predicated their argument can be a two-edged sword. Section 803(h) defines a "prisoner" as a person incarcerated "in any facility" who, inter alia, has been convicted of a crime or adjudicated delinquent. The District argues that, if the plaintiffs' construction is correct, then the words "any facility" never come into play and become superfluous.

E. Congressional intent.

In Alexander S., the court expressed the view that the CRIPA "distinguishes between a `jail, prison, or other correctional facility'" and a "juvenile facility," and that the former phrase "excludes" the latter. 113 F.3d at 1383. The court continued:
Because ... the PLRA's definition of "prison" [in Section 802] (which includes juvenile facilities) is inconsistent [with] § 1997's implicit definition of "jail, prison, or other correctional facility" (which excludes juvenile facilities), we conclude that the phrase is ambiguous.
Id. Although we do not altogether subscribe to the court's underlying analysis,[11] and although we think that the District has the better of the textual argument, we agree, especially in light of the canon of construction disfavoring redundancy, that no dispositive "plain meaning" conclusively emerges. Further analysis is therefore required to ascertain the intent of Congress. We begin that inquiry with a visit to some venerable but instructive case law.
Well before those of us who are today invoking his wisdom were born, one of this nation's most distinguished jurists wrote that statutes "should be construed, not as theorems of Euclid, but with some imagination of the purposes which lie behind them." Lehigh Valley Coal Co. v. Yensavage, 218 F. 547, 553 (2d Cir.1914) (Learned Hand, J.), cert. denied, 235 U.S. 705, 35 S.Ct. 282, 59 L.Ed. 434 (1915). Earlier still, the highest court of this jurisdiction declared that
every statute must be construed with reference to the original intent and meaning of the makers, and which intent and meaning may be collected from the cause or necessity of the enactment, and the objects intended to be accomplished by it.
Ex parte Redmond, 3 App. D.C. 317, 318 (1894). Having failed to discern a plain *873 meaning in the relevant provisions of the PLRA, we must determine whether it is the plaintiffs' interpretation or the District's that most effectively carries out the purposes that Congress sought to achieve by passing the new legislation.
The PLRA was enacted in order to "impos[e] new restrictions on class action and individual prisoner lawsuits," to "sharply circumscribe[] a prisoner's ability to seek remedies for alleged unconstitutional prison conditions," and thereby to "limit federal courts'[12] involvement in the daily operation of federal and state correctional facilities." Alexander S., supra, 113 F.3d at 1379. The plaintiffs have acknowledged in their brief in this court that the PLRA was "animat[ed]" by a general Congressional hostility to prison litigation.[13] Although that hostility was not absolute,[14] the PLRA was plainly the result of a perception in the Congress that lawyers and judges were intruding to an unacceptable degree upon the prerogatives of prison administrators, and that litigation over prison conditions should not be encouraged and should be restricted to those situations in which constitutional rights were genuinely in jeopardy. It is our duty, in interpreting the statute, to keep its dominant purpose firmly in mind.
The concerns of Congress regarding prison litigation and its perceived intrusion upon the authority of federal and state correctional officials demonstrably extended to suits brought by or on behalf of juveniles as well as to actions instituted by adults. We have previously noted that, in Section 803(h) of the PLRA, the term "prisoner" is explicitly defined as including an adjudicated juvenile delinquent. The theme implicit in this definitionnamely, that the PLRA was designed to make litigation harder for juvenile wrongdoers as well as for their adult counterpartsis echoed in other provisions of the legislation as well.
Prior to the enactment of the PLRA, the words "jail, prison, or other correctional facility" appeared in two places in the CRIPA. First, as we have seen, this phrase was a part of the definition of "institution." See 42 U.S.C. § 1997(1) (quoted in note 9, supra). Second, the phrase appeared in 42 U.S.C. § 1997e (a). Prior to its amendment by the PLRA, § 1997e (a) required a plaintiff to exhaust his or her administrative remedies (when appropriate and in the interest of justice) in any action brought "by an adult convicted of a crime and confined in any jail, prison, or other correctional facility." (Emphasis added.) The PLRA, however, amended § 1997e (a) by substituting the words "by a prisoner" for the words "by an adult convicted of a crime." (Emphasis added.) Because "prisoner" includes "adjudicated delinquent," the exhaustion requirement previously applicable only to adults had been extended so that it would now reach juvenile delinquents as well. In addition, the PLRA introduced the phrase "by a prisoner who is confined [in] any jail, prison or other correctional facility" into five new sections of the CRIPA as amended, including, as we have seen, the counsel fee provisions, 42 U.S.C. § 1997e (d).[15]
In Alexander S., the court stated:
In enacting the PLRA, Congress had far-reaching goals, and nothing in the Act *874 indicates an intent to omit juveniles confined in juvenile facilities from its impact. To the contrary, by enacting § 803 of the PLRA, Congress affirmatively amended 42 U.S.C.A. § 1997e to replace the word "adult" with the word "prisoner," and then defined "prisoner" to expressly include juveniles adjudicated delinquent of crimes.
113 F.3d at 1384. We agree with this analysis.
Finally, it is undisputed that the STOP provisions of Section 802 of the PLRA, which severely limit the substantive remedies available to plaintiffs in prison conditions litigation, apply to delinquents in juvenile facilities, for a prison is there defined as any facility that "detains juveniles or adults accused of, convicted of, sentenced for, or adjudicated delinquent for" violating the criminal law. See 18 U.S.C. § 3626(g)(5); Alexander S., supra, 113 F.3d at 1384. Concededly, this definition is not expressly carried over into Section 803 of the PLRA. Nevertheless, like the court in Alexander S., "[w]e can discern no reason for Congress to limit the more important substantive remedies available to juveniles under [Section] 802 of the PLRA, yet not [to] limit the availability of attorney's fees under [Section] 803." Id. at 1384.

F. Practical construction.

With the foregoing analysis of the statutory purposes in mind, we now consider the practical consequences of the plaintiffs' proposed construction.
The plaintiffs acknowledge that adjudicated delinquents are prisoners within the meaning of Section 803(d). They therefore also concede, as they must, that if an adjudicated delinquent were confined in a jail or prisonif, in the District of Columbia, he were confined at Lorton, rather than at Oak Hillthe PLRA's restrictions on awards of counsel fees would apply. Nevertheless, according to the plaintiffs, Section 803 has no application where, as in this case, adjudicated delinquents are confined in a juvenile facility.
Such a construction may perhaps be plausible in the abstract, but in our view it makes little practical sense. We note first that adjudicated delinquents are not ordinarily confined in adult facilities. As stated in Alexander S.:
The Juvenile Prosecution Act of 1994 prohibits the placement of juveniles in adult federal facilities. See 18 U.S.C.A. § 5039 (West Supp.1997) ("No juvenile committed, whether pursuant to an adjudication of delinquency or conviction for an offense, to the custody of the Attorney General may be placed or retained in an adult jail or correctional institution...."). Also, a juvenile who is simply "accused of" a crime or even "adjudicated delinquent" would not, under normal circumstances, be confined to an adult state facility.
113 F.3d at 1385.[16] We think it most improbable that Congress would have included adjudicated delinquents in the definition of "prisoner" in Section 803(d) and in four other provisions of the PLRA, if their inclusion would have reached only a small percentage of those delinquents. If the plaintiffs' construction of Section 803 were correct, then the change in the PLRA from "adult" to "prisoner," and the definition of "prisoner" to include adjudicated delinquents, would have had limited practical consequences.
Moreover, under the plaintiffs' construction of the Act, an attorney whose juvenile client is confined at Oak Hill is entitled to a more generous award of counsel fees than his counterpart whose client is (hypothetically) confined at Lorton. The plaintiffs have offered no explanation, in the statute or in its legislative history, for such an unusual distinction, and their own hypothetical justifications, while imaginative, are unpersuasive.[17] *875 We discern no rational basis for the notion that the Oak Hill resident's lawyer should be paid more than the attorney for his juvenile counterpart at Lorton, and we do not believe that Congress intended such a result.[18]
The construction of the PLRA urged upon us by the plaintiffs is certainly not compelled by its text. But even if the most natural reading of the statutory language supported the plaintiffs' position, the practical consequences would be decidedly odd. "Where the literal reading of a statutory term would compel an odd result, we must search for other evidence of Congressional intent to lend the term its proper scope." Public Citizen, supra, 491 U.S. at 454, 109 S.Ct. 2558 (citation and internal quotation marks omitted). In this case, the District's proposed construction is far more plausible.

III.

THE CONSTITUTIONAL ARGUMENT
In the alternative, the plaintiffs assert that Section 803(d) deprives prisoners of liberty without due process of law. They claim that Congress, "[b]y changing the standards for prison conditions cases only ... deliberately made it more difficult for prisoners to vindicate their constitutional rights by seeking redress from the courts." According to the plaintiffs, the PLRA impermissibly interferes with the "fundamental constitutional right of access to the courts". See Lewis v. Casey, 518 U.S. 343, 116 S.Ct. 2174, 2177, 135 L.Ed.2d 606 (1996) (citation omitted).
The plaintiffs do not claim, nor can they, that their own access to the courts has been infringed. In fact, the plaintiff class has been vigorously litigating this case for many years. Moreover, their primary counsel, the Public Defender Service, has not sought counsel fees from the District.[19] The plaintiffs are thus compelled to argue, in effect, that the PLRA violates the rights of persons other than themselves. Because they are attacking the constitutionality of the statute on its face, they must demonstrate that "no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).
The plaintiffs begin this obviously uphill battle with the contention that the "strict scrutiny" standard applies, in light of the "fundamental" nature of the right of access to courts. We disagree. The first step in a "fundamental right" analysis is to engage in a "careful description of the asserted right." Reno v. Flores, 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993). While the Due Process Clause does guarantee prisoners the opportunity to fairly present to the courts allegations of constitutional violations, see Wolff v. McDonnell, 418 U.S. 539, 579, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); Ross v. Moffitt, 417 U.S. 600, 616, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974), that right is not genuinely at issue here. The Constitution does not require the "permanent provision of counsel." Lewis, supra, 518 U.S. 343, 116 S.Ct. at 2181. In the present case, we see nothing "fundamental" about an asserted right to recover counsel fees in a desired amount, particularly when fee-shifting in other forms of civil litigation is the exception, not the rule. See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); see also Ross, supra, 417 U.S. at 616, 94 S.Ct. 2437 ("that a particular *876 service might be of benefit to an indigent defendant does not mean that the service is constitutionally required").
As a fall-back position, the plaintiffs argue that Section 803's counsel fee restrictions are unconstitutional even under "rational basis" analysis. Under this test, there is a "heavy presumption of constitutionality," Department of Labor v. Triplett, 494 U.S. 715, 721, 110 S.Ct. 1428, 108 L.Ed.2d 701 (1990), and the plaintiffs face the formidable burden of establishing, beyond a reasonable doubt, that the legislation transgresses the Constitution. See Hornstein v. Barry, 560 A.2d 530, 533 (D.C.1989) (en banc).
Congress was apparently motivated by a concern that the expenses of prison litigation were becoming too high. See, e.g., 142 CONG. REC. § 10576 (daily ed. Sept. 16, 1996) (statement of Sen. Abraham) (observing that the defense of prison litigation cost the states approximately $81 million dollars). Congress may also have wished to insure that attorneys for prisoners would not receive excessive fee awards at taxpayer expense. Cf. Farrar v. Hobby, 506 U.S. 103, 115, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) (Section 1988 was "never intended to produce windfalls to attorneys") (citation omitted). Finally, Congress was obviously apprehensive that litigation of this kind was intruding impermissibly on the prerogatives of prison officials and diverting them from their substantive responsibilities. We cannot say that these objectives lack legitimacy.
We also conclude that § 1997e (d) is rationally related to legitimate state interests. See City of New Orleans v. Dukes, 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976). The restrictions directly advance the permissible governmental objective of reducing prisoner litigation expenses and curtailing excessive counsel fees. According to the District, the provision most troublesome to the plaintiffs, namely, that the fee may not exceed 150% of the CJA rate, establishes a fee limit of $112.50 per hour. Nothing in the Constitution of the United States supports the contention that such a fee is unreasonable.[20]

IV.

CONCLUSION
For the foregoing reasons, the order appealed from is reversed, and the case is remanded for further proceedings consistent with this opinion.
So ordered.
NOTES
[1] See 18 U.S.C. §§ 3626(a)-(f). STOP stands for "Stop Turning Out Prisoners."
[2] any action or proceeding to enforce a provision of [42 U.S.C. § 1983], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs....
42 U.S.C. § 1988(b).
[3] This court addressed one such dispute in Jerry M. I.
[4] The plaintiffs are also represented by the Public Defender Service (PDS) and by the National Prison Project of the American Civil Liberties Union.
[5] See, e.g., Street v. Hedgepath, 607 A.2d 1238, 1243 n. 5 (D.C.1992) (federal cases interpreting a federal Rule of Civil Procedure are persuasive authority in this court's construction of identical local Rule); Arthur Young & Co. v. Sutherland, 631 A.2d 354, 361 n. 17 (D.C.1993) (this court looks to federal decisions construing federal statute for guidance in construing similar local statute). If we are guided by decisions of the federal appellate courts construing federal statutes when we interpret similar District of Columbia legislation, then those federal decisions are even more persuasive where, as here, our task is to construe the very federal statute which the United States Court of Appeals has construed.

Although the majority rule appears to be that decisions of the federal appellate courts in cases raising federal questions, while persuasive, are not binding authority on state courts, see 21 C.J.S. Courts § 159, at 196-97 (1990); 20 AM. JUR.2D Courts § 171, at 454-55 & nn. 78-80 (1995), there is significant authority to the contrary. See, e.g., Desmarais v. Joy Mfg. Co., 130 N.H. 299, 538 A.2d 1218, 1220 (1988) ("we are guided and bound by federal statutes and decisions of the federal courts interpreting those statutes"); Blue Cross & Blue Shield of Alabama v. King, 532 So.2d 1045, 1046 (Ala.Civ.App.1988) ("absent the existence of a United States Supreme Court ruling on a federal question, the decision of a federal appellate court is binding on our state courts[;] ... [h]owever, if federal decisions are in conflict, we may follow and apply the better reasoned decision") (citation and internal quotations omitted); Flanagan v. Prudential-Bache Sec., Inc., 67 N.Y.2d 500, 504 N.Y.S.2d 82, 495 N.E.2d 345, 348, cert. denied, 479 U.S. 931, 107 S.Ct. 402, 93 L.Ed.2d 355 (1986) ("we are bound to apply the [federal] statute as interpreted by Supreme Court decision or, absent such, in accordance with the rule established by lower federal courts if they are in agreement") (citing cases); Darr v. Long, 210 Neb. 57, 313 N.W.2d 215, 220 (1981) ("in the administration and interpretation of federal legislative acts, pertinent opinions of the federal courts are binding upon the state courts") (citation omitted). The District has not asked us to follow these cases or to treat Alexander S. as binding authority, and we consider that decision as persuasive precedent only.
[6] The use of dictionaries in the interpretation of statutes is entirely permissible, see, e.g., Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 477, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992), but while "`the words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing,' nevertheless `it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary[.]'" Public Citizen v. United States Dep't of Justice, 491 U.S. 440, 454, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (quoting Cabell v. Markham, 148 F.2d 737, 739 (2d Cir.) (Learned Hand, J.), aff'd, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945)); James Parreco & Son v. District of Columbia Rental Hous. Comm'n, 567 A.2d 43, 46 (D.C. 1989). Acknowledging the limits of literalism as articulated by Judge Hand, we have nevertheless opined that when we construe statutes, "it is useful to have [a dictionary] around." Riggs Nat'l Bank v. District of Columbia, 581 A.2d 1229, 1235 (D.C.1990).
[7] The court stated:

"Jail" is commonly defined as a "place for the lawful confinement of persons" or a "prison." Webster's II New Riverside University Dictionary 650 (1988). It is also defined as a "prison" or a place "usually used to hold persons either convicted of misdemeanors (minor crimes) or persons awaiting trial or as a lock-up for intoxicated and disorderly persons." Black's Law Dictionary 834 (6th ed.1990). "Correctional institution" is a "generic term describing prisons, jails, reformatories and other places of correction and detention." Id. at 344. And, "house of correction" is defined as a "prison for the reformation of petty or juvenile offenders." Id.
113 F.3d at 1383.
[8] "The Juvenile Court is theoretically engaged in determining the needs of the child and of society rather than adjudicating criminal conduct." Kent, supra, 383 U.S. at 544, 86 S.Ct. 1045 (emphasis added); L.J., supra, 546 A.2d at 437.
[9] The CRIPA provides, in pertinent part, as follows:

(1) The term "institution" means any facility or institution
(A) which is owned, operated, or managed by, or provides services on behalf of any State or political subdivision of a State; and
(B) which is
(i) for persons who are mentally ill, disabled, or retarded, or chronically ill or handicapped;
(ii) a jail, prison, or other correctional facility;
(iii) a pretrial detention facility;
(iv) for juveniles
(I) held awaiting trial;
(II) residing in such facility or institution for purposes of receiving care or treatment; or
(III) residing for any State purpose in such facility [with certain exclusions]; or
(v) providing skilled nursing, intermediate or long-term care, or custodial or residential care.
42 U.S.C. § 1997(1) (emphasis added).
[10] We note, however, that if there is an overlap between subsection (ii) and subsection (iv), it is a partial overlap only. Subsection (iv) includes institutions which are not correctional in nature at all, and those institutions are not swallowed up by subsection (ii)'s "jail, prison, or other correctional facility."
[11] For the reasons stated in Part II. D, supra, we do not believe that the CRIPA's definition of "jail, prison, or other correctional facility" necessarily excludes facilities for adjudicated delinquents, and we therefore discern no conflict between the CRIPA and the PLRA as to the meaning of the term.
[12] Although the court in Alexander S. referred to federal courts' involvement, it is undisputed that the PLRA applies with equal force to suits instituted in the Superior Court.
[13] The plaintiffs contend, however, that this hostility does not shed light on the proper construction of individual provisions of the statute.
[14] While attempting to deter frivolous prisoner litigation, "Congress preserved the rights of prisoners with valid claims to have access to an attorney and seek legal redress for meritorious claims by including the provision for attorney fees." Hernandez v. Kalinowski, 146 F.3d 196, 200 (3d Cir.1998).
[15] See also 42 U.S.C. § 1997e (c) (providing for the immediate dismissal of frivolous lawsuits); § 1997e (e) (limiting recovery for emotional injury); § 1997e (f) (restricting removal of prisoner from confinement during pretrial proceedings); § 1997e (g) (defendant's failure to respond to complaint regarding prison conditions not to be treated as an admission). There are, however, several provisions of the PLRA which expressly apply only to adults. See, e.g., PLRA § 809(a), 28 U.S.C. § 1932 (limiting revocation of earned release credit to adults convicted of a crime and confined in a federal correctional facility). By contrast, no such express limitation appears in the counsel fee provision.
[16] But cf. 28 C.F.R. § 31 (1996), promulgated after the PLRA became effective, and authorizing transfer of adjudicated delinquent to adult facility where a delinquent has reached the full age of criminal responsibility and where the transfer is authorized by state law; In re C.B., 708 So.2d 391, 399 (La.1998); Bureau of Justice Statistics, Prison and Jail Inmates at Midyear 1997 (1998).
[17] According to the plaintiffs, Congress might have concluded that juveniles in adult facilities can adequately protect their own rights through pro se litigation. In contrast, juveniles in juvenile facilities are alleged to be less able to do so, and the plaintiffs say that Congress may have refrained from imposing any counsel fee restrictions that would create a disincentive for attorneys to undertake to represent such juveniles. But no infant, wherever he or she may be confined, has the capacity to sue without a representative, Fed.R.Civ.P. 17(c), and the plaintiffs have not identified any jurisdiction which has a different rule.

The plaintiffs also assert that the different treatment of juveniles confined to juvenile facilities makes sense at least within the context of Section 803(a), 42 U.S.C. § 1997e (a), because a rule which requires all inmates of adult facilities to exhaust their administrative remedies may be more efficient than one which applies only to the adult inmates of an adult facility. This "efficiency" explanation does not, however, provide a rationale for Section 803(d)'s restriction on counsel fees.
[18] Indeed, the Supreme Court of Louisiana has held that where a juvenile is transferred to an adult facility, he acquires protections greater than those that he had when he was confined in a juvenile facility (e.g., the right to a jury trial). See In re C.B., supra note 16, 708 So.2d at 399-400.
[19] Nor is the PDS permitted to do so. See D.C.Code § 1-2702(a)(2) (1992).
[20] Because we do not entertain "grave doubts" as to the constitutionality of Section 803(d), our construction of the statute is unaffected by constitutional considerations. Almendarez-Torres v. United States, ___ U.S. ___, ___, 118 S.Ct. 1219, 1228, 140 L.Ed.2d 350 (1998) (citations omitted).