Vanessa **LEWIS**, as Parent and Legal Guardian of Cory Devane **LEWIS**, a Minor Child, and Cory Devane Lewis, Plaintiffs,

v.

Aaron **GAGNE**; Joseph Rumpf; "John Does," 1 and 2, as fictitious names and the real identity of this individual who, upon information and belief, is an Officer and/or Employee of the New York State Office of Children and Family Services employed at the Tryon Residential Facility, in their Individual and Official Capacities; and Jane Doe No. 1, as fictitious name and the real identity of this individual who, upon information and belief, is a nurse employed by the New York State Office of Children and Family Services, in her Individual and Official Capacity, Defendants.

No. 1:02 CV 129.

United States District Court, N.D. New York.

Aug. 20, 2003.

---

Elmer R. Keach, III, Esq., Albany, NY, for Plaintiffs.

Eliot Spitzer, Attorney General of the State of New York (Nelson Sheingold, Esq., Asst. Attorney General, of Counsel), Albany, NY, for Defendants.

### ORDER

HURD, District Judge.

## I. *INTRODUCTION*

Pursuant to 42 U.S.C. § 1983, Corey Lewis ("Lewis") and his mother, Vanessa Lewis (collectively "plaintiffs"), brought suit against Aaron Gagne ("Gagne"), Joseph Rump ("Rump") and others employed by the New York State Office of Children and Family Services ("OCFS") (collectively "defendants"), alleging excessive use of

force and deliberate indifference to serious medical needs in violation of the Eighth and Fourteenth Amendments. On April 9, 2003, defendants filed a motion for judgment on the pleadings, claiming Lewis failed to exhaust administrative remedies as required under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e. Plaintiffs opposed. Oral argument was heard on June 24, 2003, in Albany, New York. Decision was reserved.

## II. FACTUAL BACKGROUND

### A. The Incident

In 2001, Lewis, having been adjudicated delinquent, was a resident at the Tryon Residential Facility ("the facility") in Johnstown, New York. The facility is operated under the auspices of OCFS. On March 5, 2001, plaintiffs claim that Youth Division Aides Gagne and Rump, while attempting to restrain Lewis, who was age thirteen at the time, intentionally caused his hand and wrist to be seriously burned on a metal heater. Following the incident, the burn was examined by facility nurses who then cleaned, applied ointment, and dressed the burn. Plaintiffs claim that one nurse recommended that the burn be seen by a doctor. However, despite the severe nature of the injury, he was deliberately denied further medical treatment in an outside hospital or by a burn specialist.

### B. Formal Grievance Procedure

The facility operates under the ultimate supervision of OCFS, which has been given a legislative mandate to create a formal grievance procedure in juvenile residential facilities. See N.Y. Exec. Law § 500 (McKinney's Supp.2003). OCFS, in turn, has delegated the formulation of grievance procedures to the individual residential facilities. The facility's operation manual and the policy manual of OCFS, mirroring the policy for grievance procedures for prisons in New York, N.Y. Comp.Codes R.

& Reg. tit. 7, § 701.1, recognize, however, that the formal grievance procedure created "is intended to supplement, not replace, existing formal or informal channels of problem resolution." (Dkt. No. 14, Ex. C; Dkt. No. 15, Ex. A)

The facility's formal grievance process, comprised of three main administrative appellate levels, is described as follows. Within fourteen days of an incident a resident wishes to grieve, he or she must fill out a grievance form and place it in one of the designated grievance mailboxes located throughout the facility. If the grievance is denied, or if he or she does not receive a response within fourteen days, the resident has seven days to fill out a grievance appeal form and place it in one of the grievance mailboxes. The director of the facility, or the director's designee, is then supposed to respond to the grievance appeal within fourteen days. If the resident is unsatisfied with such response, he or she then has seven days to fill out a different grievance appeal form and turn it into the Deputy Commissioner for Rehabilitative Services, or the designee of the same. The response of the Deputy Commissioner or his or her designee completes the facility's administrative grievance appeal process. Defendants claim Lewis has used this formal process on numerous occasions, both before and after the events of March 5, 2001.

### C. Plaintiffs' Informal Grievance Efforts

Plaintiffs claim that both Lewis and others made efforts to pursue his grievance arising out of the events of March 5, 2001. Specifically, they claim Lewis filled out a grievance form and complained to several facility employees, including his Youth Division Counselor, "Nurse Chrissy," and the Youth Division Aide assigned to his living unit. He also informed his mother about

the incident and the allegedly inadequate medical treatment thereafter. Plaintiffs claim that Vanessa Lewis complained to Robert Dick, a senior counselor at the facility. She even reported the alleged excessive force and inadequate medical care to the New York State Child Abuse and Maltreatment Register, and filed a petition in family court to have her son transferred from the facility. Incidentally, plaintiffs claim that attorneys for OCFS, in addition to being involved in the family court proceedings initiated by Vanessa Lewis, were made aware of Lewis's allegations through conversations with plaintiffs' counsel. Plaintiffs claim their counsel also informed the facility director of the allegations.

On April 7, 2001, during a visit to the facility, when Vanessa Lewis complained to Robert Dick about the incident and alleged inadequate medical treatment, he told her that the administration reviewed the incident and that the burn was being treated. He subsequently notified the facility director about her complaint and attached a copy of the incident report, an Administrative Review of Restraint/Physical Force form evaluating Gagne and Rump's conduct and a record of the medical attention Lewis had received. Later on April 13, 2001, Lewis was interviewed regarding the incident. The interview was recorded, and he signed an Investigation Interview Form attesting to the truth of the recording.

## III. *DISCUSSION*

### A. *Standard for Judgment on the Pleadings*

Defendants have moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c), alleging Lewis failed to exhaust administrative remedies as required by the PLRA. Defendants present their motion under Fed.R.Civ.P. 12(b)(1), but, acknowledging a circuit split, move alternatively under Fed.R.Civ.P. 12(b)(6), which would convert the motion to one for summary judgment under Fed.R.Civ.P. 56(b). Plaintiffs contend that the motion should be considered as one asserting an affirmative defense.

"If non-exhaustion is not clear from the face of the complaint, a defendant's motion to dismiss should be converted, pursuant to Rule 12(b), to one for summary judgment limited to the narrow issue of exhaustion and the relatively straightforward questions about the plaintiff's efforts to exhaust, whether remedies were available, or whether exhaustion might be, in very limited circumstances, excused." *McCoy v. Goord,* 255 F.Supp.2d 233, 251 (S.D.N.Y.2003) (citation omitted). Here, non-exhaustion is not clear on the face of plaintiffs' complaint. The allegations in the complaint do not address Lewis's efforts to exhaust. While defendants in their Answer raise exhaustion as an affirmative defense, they do not specifically allege facts relevant to whether Lewis exhausted his administrative remedies. All facts relating to exhaustion appear in motion memorandum and supplemental documents. Defendants' motion is therefore converted to one for summary judgment limited to the issue of exhaustion of remedies.[1]

At summary judgment, defendants have the burden of proving failure to exhaust as an affirmative defense. *Jenkins v. Haubert,* 179 F.3d 19, 28–29 (2d Cir.1999). Summary judgment will be granted when "there is no genuine issue as to any mate-

---

1. It is not necessary to allow or require the submission of additional materials. Defendants expressly requested the motion conversion, if applicable, and plaintiffs essentially argued for it. Thus, both parties submitted sufficient material for decision in motion memorandum and supplemental documents.

rial fact and the moving party is entitled to a judgment as a matter of law." Fed Rule Civ. Proc. 56(c). "Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the non-movant." *Jackson v. Johnson,* 118 F.Supp.2d 278, 286 ( N.D.N.Y.2000) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Project Release v. Prevost,* 722 F.2d 960, 968 (2d Cir.1983)).

### B.  *Applicability of the PLRA*

■ As a preliminary matter, it needs to be determined whether the PLRA applies to Lewis, so as to burden him with the statutory obligation to exhaust administrative remedies. Defendants argue that because Lewis was adjudicated delinquent and was detained in a correctional facility, the question should be answered in the affirmative. Plaintiffs argue that the PLRA applies only to prisoners in criminal custody, and that juveniles adjudicated delinquent in New York, like Lewis was, are civilly detained.

The PLRA defines a prisoner as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or *adjudicated delinquent* for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h) (emphasis added). The plain meaning of this language clearly includes juveniles. Lewis's residence in the facility was compelled after he was "adjudicated delinquent" for acts amounting to a violation of criminal law. Further, Congress's use of the phrase "adjudicated delinquent," which could only possibly apply to those minors passing through the system set up for minors, evinces an intent to include juveniles within the purview of the PLRA. The few courts that have addressed the issue are in agreement. *See Alexander v. Boyd,* 113 F.3d 1373, 1384 (4th Cir.1997); *District of Columbia v.*

*Jerry M.,* 717 A.2d 866, 874 (D.C.1998); *Doe v. Cook County,* No. 99–CV–3945, 1999 WL 1069244, at * 12–13 (N.D.Ill. Nov. 22, 1999). Therefore, Lewis is obligated to exhaust his administrative remedies per the PLRA.

### C.  *Exhaustion of Remedies*

■ Section 1997e(a) of PLRA mandates that "[n]o action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." "For litigation within §§ 1997e(a)'s compass, Congress has replaced the 'general rule of non-exhaustion' with the general rule of exhaustion." *Porter v. Nussle,* 534 U.S. 516, 525, 122 S.Ct. 983, 152 L.Ed.2d 12, (2002). Yet, "[w]hile *Porter* requires exhaustion, it does not delineate what constitutes 'exhaustion.' " *Hock v. Thipedeau,* 245 F.Supp.2d 451, 454 (D.C.Conn.2003).

Courts have repeatedly held that administrative remedies are exhausted through the use of a formal grievance procedure. *See Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347–48 (S.D.N.Y.2002) (citing *Kearsey v. Williams,* No. 99–CV–8646, 2002 WL 1268014, at *2 (S.D.N.Y. June 6, 2002); *Parkinson v. Goord,* 116 F.Supp.2d 390, 394 (W.D.N.Y.2000)). Here, Lewis did not do so. He handed his written grievance to a facility Youth Division Aide, as opposed to placing it in the designated grievance mailbox, and he failed to file an appeal after not receiving a response within the applicable time frame. Thus, he failed to formally exhaust his administrative remedies through the facility's grievance program. *See e.g., Rodriguez,* 209 F.Supp.2d at 347.

However, the Second Circuit has recognized that remedies may sometimes be

exhausted through the use of informal channels. *See Ortiz v. McBride,* 323 F.3d 191, 194 (2d Cir.2003); *Marvin v. Goord,* 255 F.3d 40, 43 (2d Cir.2001); *see also Perez v. Blot,* 195 F.Supp.2d 539, 545–46 (S.D.N.Y.2002). It is statutorily expressed in New York that "[t]he inmate grievance program is intended to supplement, not replace, existing formal or informal channels of problem resolution." N.Y. Comp. Codes R. & Reg. tit. 7, § 701.1. This is precisely the language used in the facility's operation manual, and is precisely the language cited by the Second Circuit as support for its determination that remedies may be exhausted informally. *See Marvin,* 255 F.3d at 43, n. 3; *see also Perez,* 195 F.Supp.2d at 545.

Furthermore, there are provisions within the OCFS and facility documents that imply that the grievance procedure is not the exclusive means available for addressing legal issues regarding the facility's treatment of residents. The Handbook that Lewis reviewed as part of his orientation at the facility provides a juvenile with an overview of the OCFS, a list of services available to further the rehabilitation and safety of residents, notice of the disciplinary process and various domestic rules, and notice of his legal rights. The grievance program is presented within the context of the other steps a resident may take to assert their legal rights. For example, the Handbook, after explaining how to contact the OCFS ombudsman, lists the following as ways a resident can make his or her concerns known about the way he or she is treated:

You may tell your concerns to the Counselor assigned to your unit or to any other employee.

If you feel your concerns are not being addressed, you may fill out a Resident Grievance Form. (See section on Resident Grievance Program to find out how to file a grievance.)

Every OCFS facility employee is required to report suspected cases of abuse or maltreatment to the New York State Child Abuse Hotline. If a facility employee suspects that you have been abused or maltreated, the employee must see to it that a report is made to the Hotline for investigation.

(Dkt. No. 14, Ex. D, p. 3) (emphasis added). The Handbook does not list the order in which these options are to be undertaken, nor does it otherwise indicate that the formal grievance procedure is the first, much less the only, option available. If the facility, or the state for that matter, considered the grievance procedure to be the exclusive method of redress, one would think its invocation would be mandatory. While the OCFS policy manual, the facility manual and the Handbook would assure a resident that no reprisals will be taken against them for use of the grievance program, there are no references to the consequences of its non-use. In short, none of the documents present the program as mandatory or exclusive.

In addition, the facility's own actions demonstrate that the formal grievance procedure need not always be followed to address a problem and prompt an investigation.[2] Vanessa Lewis was told on April 7, 2001, that the administration had reviewed the March 5, 2001, incident.[3] The

---

**2.** The earliest effort supported by the record that likely triggered administrative attention was the verbal complaint made by Vanessa Lewis on April 7, 2001.

**3.** Robert Dick, Sr. Youth Division Counselor, stated in an OCFS memorandum to Jim Con-

kling, Facility Director, that in speaking with Vanessa Lewis, he "indicated that administration had reviewed the incident and that Medical has been treating his injury." (Dkt. No. 19, Keach Aff.)

record includes a copy of an Administrative Review of Restraint/Physical Force form wherein the conduct of Gagne and Rump was evaluated. This form, a record of the medical attention Lewis received, and the representation made to Vanessa Lewis were forwarded to the facility director the same day. On April 13, 2001, Lewis was interviewed regarding the incident in the Office of the Assistant Director of the facility.

The facility's formal grievance program is not the exclusive means available to Lewis to exhaust his administrative remedies. The OCFS policy contains language mirroring that used in the case law recognizing informal methods of exhaustion in the New York State Department of Correctional Services and prison context. OCFS and facility documents presenting, referring to, and explaining the grievance procedure treat the program as only one method of resolution. Furthermore, the facility demonstrated its willingness to address and investigate a complaint filed outside the formal grievance process.

■ Since the facility's formal grievance program is not the exclusive means of exhaustion, the question becomes whether the informal efforts made to address Lewis's allegations administratively are sufficient to satisfy the essential functions of the exhaustion requirement. This must be answered in the affirmative.

Besides verbal complaints to facility staff, Vanesa Lewis contacted an attorney, family court, and The New York State Child Abuse and Maltreatment Register. Both the facility director and OCFS counsel knew that plaintiffs' counsel was pursuing the matter. While not the preferred or most efficient channels of seeking administrative redress, plaintiffs' informal efforts demonstrate a reasonable attempt to exhaust all possible means before filing in federal court. *See O'Connor v. Featherston,* Civ. No. 01–CV–3251, 2002 WL 818085, at *2 (S.D.N.Y. April 29, 2002) (listing plaintiff's making a "reasonable attempt" to exhaust administrative remedies as one reason courts have found exhaustion of remedies outside a grievance procedure.); *Heath v. Saddlemire,* Civ. No. 96–CV–1998 WL 31242204, at *13–14 (N.D.N.Y. Oct. 7, 2002).

Moreover, plaintiffs had reason to believe that the events in question were investigated; however, they disagreed with the outcome and persisted in their efforts toward administrative redress. As noted above, Vanessa Lewis was told that the facility administration had reviewed the incident. Lewis knew he was interviewed at the facility five weeks later as part of an investigation. The New York State Child Abuse and Maltreatment Register notified Vanessa Lewis that by law OCFS had sixty days to complete an investigation into her report of the maltreatment.[4]

Noting that an investigation into the incident did ensue, it is reasonable that plaintiffs believed that at least one effort they took accomplished the same result that filing through the formal process would have produced. *See Perez,* 195 F.Supp.2d at 546 ("To the extent that plaintiff's allegations are true, he would seemingly have accomplished much of what he might otherwise have achieved by way of the formal IGP process, as his alleged complaints to correctional officials about the assault purportedly secured the same favorable resolution available to him pursuant to the procedure enumerated in Section 701.11."); *see also O'Connor v.*

---

4. Defendants' argument that Vanessa Lewis's call to the New York State Child Abuse Hotline is irrelevant in exhausting remedies on her son's behalf is suspect considering the OCFS Handbook lists the Hotline as one method of assuring a resident access to legal relief concerning his treatment at the facility.

*Featherstone,* Civ. No. 01–CV–3251, 2003 WL 554752, at *10 (S.D.N.Y. Feb. 27, 2003) ("An inmate should not be required to additionally complain through collateral administrative proceedings after his grievances have been apparently addressed and, by all appearances, rebuffed.") (citing *Marvin,* 255 F.3d at 43 n. 3; *Heath, supra* at *13–14).

Plaintiff's pursuit of the grievance through informal channels is sufficient to satisfy the exhaustion requirement of the PLRA.[5] Defendants were afforded, and took advantage of, the opportunity to address Lewis's claims. The allegations in this case do not amount to the classic frivolous claim Congress sought to "filter out" in enacting the PLRA. *See Porter,* 534 U.S. at 524–25, 122 S.Ct. 983. And, as mentioned, there is an administrative record clarifying the contours of the case as a result of efforts made on behalf of Lewis.

### D. *Fourth and Fifth Amendments*

Plaintiffs have withdrawn all claims under the Fourth and Fifth Amendments. *See Jackson v. Johnson,* 118 F.Supp.2d at 286–287.

## IV. *CONCLUSION*

Application of the PLRA requires Lewis to exhaust administrative remedies. Lewis did not exhaust through the use of the formal grievance program, but OCFS and the facility recognize the use of informal channels. The collective informal efforts made by plaintiffs are sufficient to satisfy the exhaustion requirement. Therefore, defendants' assertion of failure to exhaust administrative remedies as an affirmative defense fails.

---

**5.** It should be noted that even if plaintiffs' informal efforts were insufficient to satisfy exhaustion, dismissal would be without prejudice. *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002). If plaintiffs were to refile when Lewis ceased being incarcerated, the

Accordingly, it is

ORDERED that

1. Defendants' affirmative defense No. 14—failure to exhaust administrative remedies—is DISMISSED;

2. Defendants' motion for summary judgment is DENIED; and

3. Plaintiffs' claims under the Fourth and Fifth Amendments are DISMISSED.

IT IS SO ORDERED.

PLRA—and its exhaustion requirement—would no longer apply. *See Greig v. Goord,* 169 F.3d 165, 167 (2d Cir.1999). Thus, the disposition of defendants' motion has produced the unintended benefit of judicial economy as well.