**M.C. McILWAIN, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 87–793.

District of Columbia Court of Appeals.

Submitted March 28, 1989.
Decided Dec. 28, 1989.

William T. Morrison, Silver Spring, Md., appointed by this court, was on the brief for appellant.

Jay B. Stephens, U.S. Atty., with whom Michael W. Farrell, Asst. U.S. Atty. at the time the brief was filed, Helen M. Bollwerk, J. Edward Agee, Washington, D.C., and Su Zann Lamb, Asst. U.S. Attys., were on the brief, for appellee.

Before BELSON, Associate Judge, and KERN and MACK,* Senior Judges.

KERN, Senior Judge:

This appeal presents for our determination whether the trial court committed reversible error by admitting into evidence an inculpatory statement uttered by appellant while in his room in the boarding house in which he lived. This was the scene of the crimes with which he was later charged and convicted by a jury—enticing a child, sodomy and taking indecent liberties with a

* Judge Mack was an Associate Judge of the court at the time of submission of this case. She was commissioned as a Senior Judge on December 1, 1989.

child.[1] We conclude there was no error and affirm.

The particular facts and circumstances of this case implicate both the Fourth and Fifth Amendments and their interrelationship when a defendant is seized on the scene, within the meaning of the Fourth Amendment, for questioning, then questioned, and only then placed under formal arrest and taken into police custody so as to trigger the application of the Fifth Amendment. The unique facts and circumstances of this case are determinative of our decision and so we explicate them in detail.

Appellant boarded with a family consisting of four generations who lived in a house on Florida Avenue in northwest Washington. He occupied a room on the third floor next to a bathroom and was permitted to prepare meals for himself in the kitchen of the house, provided he took the meal itself into his room. On the day in question, appellant, while preparing his supper in the kitchen, conversed with the victim, the six-year-old grandson of the matriarch of the house, Mrs. Madison. Mrs. Madison overheard appellant offer the victim and his playmate money and reproved appellant for such an offer.

Appellant went to his room on the third floor to eat his supper and soon afterwards the victim went to the third floor bathroom. The victim was away for approximately five to ten minutes, prompting his grandmother to call out for him. In the meantime, the victim's older brother went to use the third floor bathroom and saw the victim emerge from appellant's room and heard appellant promise to give him five dollars. The victim looked frightened and his trousers were unzipped. The victim told his brother that appellant had "touched him."

The two brothers returned to the ground floor of their home and reported to their grandmother what had happened. Thereupon, she summoned appellant to the kitchen and confronted him with the victim's story. When appellant denied the allegation, the victim's brother struck appellant five times, ultimately knocking him to the floor. The grandmother first ordered appellant to leave her home but then instructed him to return to his room and stay there until the police arrived.

Mrs. Madison, however, decided not to call the police until the victim's mother came home from work and could be consulted. She arrived at 6:00 p.m. and was briefed by the family. Thereupon, she rushed to the third floor, confronted appellant and then struck him twice, and advised him that she was calling the police. At that time, the victim's brother resumed his attack upon appellant, striking him twice before his mother could get him out of appellant's room. By that time, members of the victim's family had struck appellant a total of nine times.

The victim's mother telephoned the police and two uniformed officers arrived within thirty minutes. While waiting for their arrival, the victim told his mother what had happened. By that time the victim had told his story, in varying degrees of detail to his mother, his grandmother, and his brother. So far as the record shows, the uniformed officers did not speak with the victim or appellant. Rather, in accordance with standard police department operating procedures, as soon as they learned the unique and sensitive nature of the alleged offense, they called the Sex Offense Squad to undertake the investigation. One uniformed officer did take up a position in the hallway outside appellant's room, where appellant had remained after the officers arrived.

Some thirty minutes later two members of the Sex Offense Squad responded to the victim's home. The ranking detective spoke in turn with the victim, his brother, his mother and his grandmother, all on the ground floor of the home; the other detective went to appellant's room and spoke generally with him. She did not question him about the case but did ask whether he had sometime earlier been "involved in a case" with her partner. Appellant did not respond to this question, but complained about the beatings he had received from both the victim's mother and brother.

---

1. D.C.Code §§ 22–3501(b), –3502, –3501(a)    (1981).

Finally, the detective in charge entered appellant's room and asked him what had happened. Appellant, in an effort to exculpate himself, responded to the detective's question with the answer that the victim had been in his room after using the bathroom, and that he had pulled down the victim's pants only for the purpose of putting the child's penis back into his pants. Thereupon, the detective placed appellant under arrest and took him to the station house.

Appellant moved pre-trial to suppress the statement he had made to the detective. The court ruled that when the detective asked appellant what had happened he was not in custody so as to trigger *Miranda*[2] and so the detective need not have first given appellant a *Miranda* warning.[3] Thus, the court denied the motion.

The essence of appellant's argument on appeal is

that what had initially begun as an investigative stop had assumed the character of a seizure by the time the suspect was questioned by Detective Davis [the Sex Offense Squad detective in charge of the investigation]. As a consequence, Detective Davis' inquiry about the incident constituted custodial interrogation and required that [appellant] be advised of the full litany of his *Miranda* rights.

The government on appeal concedes that what the detective said to appellant before asking him what had happened, *viz.*, that he was not under arrest, that he did not have to talk, and that what he said could be used against him, did not constitute a complete *Miranda* warning. Nevertheless, the government argues that, under the particular circumstances here, the inquiry by the detective to appellant as to what had happened did not constitute *custodial* interrogation, and hence, did not trigger *Miranda*.

Justice Marshall has reminded us in *Berkemer v. McCarty*, 468 U.S. 420, 439–40,

104 S.Ct. 3138, 3149–50, 82 L.Ed.2d 317 (1984), that:

Under the Fourth Amendment, we have held, a policeman who lacks probable cause but whose "observations lead him reasonably to suspect" that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to "investigate the circumstances that provoke suspicion." (Citation omitted.) "[T]he stop and inquiry must be 'reasonably related in scope to the justification for their initiation.'" Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide probable cause to arrest him, he must then be released. The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda....*

\* \* \* \* \* \*

It is settled that the safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a "degree associated with formal arrest."

(Citations omitted.)

In the instant case it is clear that the uniformed police officers who arrived at the victim's home and who had *no* contact with appellant nevertheless did "seize" appellant within the meaning of *Terry*.[4] However, these two officers had reason to suspect a crime had been committed based upon what the victim's brother saw and heard and upon what the victim told the family. There is nothing to suggest that the stationing of the uniformed officer outside of appellant's door was coercive or

---

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**3.** In fact, the detective had advised appellant at the outset of the conversation in his room that he was *not* under arrest, that he did not have to talk, and that anything he said could be used against him.

**4.** *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

excessively intimidating; to the contrary, it is reasonable to infer that the officer was acting not only to "freeze" a suspected criminal situation, but also to protect appellant from further assault by the victim's family. Thus, while seized, appellant was not in custody to the "degree associated with formal arrest."

■ Appellant urges that the *Terry* stop initiated by the arrival of the uniformed officers at the home where he boarded had ripened, by reason of the passage of thirty more minutes before the Sex Offense Squad detectives arrived, into a full-blown custodial interrogation when the "lead" detective walked into appellant's room and asked appellant what had happened. We disagree. The Supreme Court, in *United States v. Sharpe,* 470 U.S. 675, 686–87, 105 S.Ct. 1568, 1575–76, 84 L.Ed.2d 605 (1985), has stated the test to be applied:

> In assessing whether a [*Terry* ] detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. . . . The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

(Citation omitted.)

We cannot conclude under the particular circumstances here that the uniformed officers acted unreasonably in calling to the scene law enforcement officers specially trained to deal with the uniquely difficult offense of sexual abuse of a child.[5] The Supreme Court has "cautioned that courts should not indulge in 'unrealistic second-guessing' " and admonished that "[a]uthorities must be allowed 'to graduate their response to the demands of any particular situation.' " (Citations omitted.) *United States v. Montoya De Hernandez,* 473 U.S. 531, 542, 105 S.Ct. 3304, 3311, 87 L.Ed.2d 381 (1985).

Nor can we conclude that the actions of the Sex Offense Squad detective in the moments after he entered appellant's room transformed the situation from a valid *Terry* seizure into "custody" of the kind "associated with formal arrest." The officer specifically informed appellant that he was not under arrest. He made a single, non-suggestive, nonaccusatory inquiry in the familiar surroundings of appellant's room. The fact that the focus of the investigation had fallen upon appellant could not alone necessitate *Miranda* warnings in what was otherwise a valid *Terry* investigation. *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976).

In sum, we conclude that the detective's question of appellant under the circumstances did not amount to custodial interrogation, and hence, did not violate *Miranda.* Our holding, in recognition of the Supreme Court's teaching that "the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving *Miranda* protection. . . ." *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983),[6] rests upon and is limited to the particular facts of this case.

*Affirmed.*

---

**5.** *See generally,* N.Y. Times, May 21, 1989, § 6 (Magazine), at 28–90–91 (discussing difficulties when accusations of sexual abuse are made); The Washington Post, May 31, 1989, D1, D2 (excessive questioning of alleged victims of child abuse may have led to questionable testimony at trial).

**6.** For an example of how the subtleties of the circumstances have influenced the decisions of this court, compare *Hairston v. United States,* 500 A.2d 994 (D.C.1985) (appellant not in custody when officer, with gun drawn, asked "what happened" after arriving on scene of crime) with *Miley v. United States,* 477 A.2d 720 (D.C.

1984) (when officer, with gun drawn, approached appellant, appellant's movement sufficiently curtailed to constitute custody).

Thus, it is not surprising that our dissenting colleague reaches a different conclusion than does the majority upon the circumstances here on the decisive issue: whether appellant, when first questioned in his own room by the Sex Squad detective as to what had happened, was in custody to the degree associated with formal arrest so as to require the detective to have given him a *Miranda* warning. We are persuaded to our conclusion by the particular nature of the crime alleged by the Madisons to have been committed by appellant; their beat-

MACK, Senior Judge, dissenting:

The majority and I agree that the safeguards prescribed by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), become applicable as soon as a suspect's freedom of action is curtailed to a "degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983)); the question to be asked is whether the stop "exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." *Berkemer, supra*, 468 U.S. at 437, 104 S.Ct. at 3148.

I emphatically part company with the majority, however, when it concludes that *Miranda* is not applicable here because appellant's seizure amounted to no more than a *Terry* stop.[1] In my view the situation in this case is one in which Mr. McIlwain's freedom was significantly curtailed and where he was "in custody" for *Miranda* purposes. By my calculation appellant had been detained in his bedroom for a period of at least forty-five minutes with a police officer posted outside the door and another uniformed officer within the house. The residents of the house had called the police to specifically report that appellant had committed the offense and this fact was confirmed when arriving detectives interviewed these residents and the victim. When the police continued to detain appellant after an initial investigation and after their suspicions hardened, the officers were required to give appellant *Miranda* warnings prior to further questioning. Indeed, the interrogating detective appeared to realize this in that he attempted to recite the warnings to appellant. The fact that he failed to recite them correctly (as the government concedes) should not give rise to this post-hoc holding that appellant was not "in custody" at the time.

I respectfully dissent.

---

ings of appellant before sending him to his room in their home; and, the fact that the uniformed officers who responded to the scene and remained outside appellant's room had no communication with him until the Sex Squad detective arrived.

1. The majority, in quoting a passage from the *Berkemer* opinion to sustain its position, omits a significant beginning sentence:
   In both of these respects [*i.e.,* whether a seizure is made in public view and whether the scene is "police dominated"] the usual traffic stop is more analogous to a so-called *"Terry* stop," *see Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), than to a formal arrest.
   *Berkemer, supra*, 468 U.S. at 439, 104 S.Ct. at 3149. Indeed Mr. Justice Marshall, in stressing the difference between a *Terry* stop and a formal arrest, was careful to point out that "most traffic stops resemble, in *duration and atmosphere,* the kind of *brief determination* authorized in *Terry. Id.* at 439 n. 29, 104 S.Ct. at n. 29 (emphasis added). These factual situations were contrasted with those in which *Miranda* is brought into play. *See Berkemer, supra,* 468 U.S. at 439 & n. 28, 104 S.Ct. at 3150 & n. 28 (footnote citing *Orozco v. Texas,* 394 U.S. 324, 325, 89 S.Ct. 1095, 1096, 22 L.Ed.2d 311 (1969)) (suspect questioned in his bedroom by four officers) and *Mathis v. United States,* 391 U.S. 1, 2–3, 88 S.Ct. 1503, 1504, 20 L.Ed.2d 381 (1968) (defendant questioned in jail by government agent).