906 A.2d 249 (2006)
IN RE I.J.
District of Columbia, Appellant.
No. 03-FS-671.
District of Columbia Court of Appeals.
Argued December 3, 2004.
Decided October 13, 2005.[*]
Amended August 17, 2006.
*251 Stacy L. Anderson, Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General for the District of Columbia, Edward E. Schwab, Deputy Attorney General, and Rosalyn Calbert Groce, Assistant Attorney General, were on the brief, for appellant.[**]
*252 M. Eve Hanan, Public Defender Service, with whom James Klein and Jaclyn Frankfurt, Public Defender Service, were on the brief, for appellee.
Before FARRELL, RUIZ and REID, Associate Judges.
RUIZ, Associate Judge:
Appellee was charged as a juvenile with possession of marijuana. Following an evidentiary hearing, certain statements made by appellee were suppressed after the trial judge found that appellee who had not been given Miranda warnings,[1] was in custody when questioned by the police. The judge dismissed the charge pending against appellee, and the government appealed the judge's suppression order. We agree that appellee was in custody when he was interrogated without benefit of the required Miranda warnings, and affirm the trial judge's dismissal.

I.

Motion to Suppress
On March 31, 2003, Officer Michael Minor was dispatched to the Kennedy Youth Center, in the Northwest quadrant of the District. Staff members at the Center had called 911 earlier that morning to report that they were detaining one of the residents  appellee  because they had discovered what they suspected to be marijuana among his possessions. Appellee, who was sixteen years old at the time, was residing at the Center under a probation order of the Superior Court.
When Officer Minor arrived at the youth center, he was greeted by Mr. Rawlings, who identified himself as one of the counselors at the center. Officer Minor and Mr. Rawlings conversed briefly in the entry hall of the center. Mr. Rawlings informed the officer that after several residents of the center had told him that morning that appellee had marijuana, he searched under appellee's bed, and discovered two vials containing a green, leafy substance. He had then confronted appellee, who exclaimed, "damn, got my loot!" The staff of the center then placed appellee in a small office adjacent to the entry hall and called the police. Appellee remained in this room until Officer Minor arrived. The conversation between Officer Minor and Mr. Rawlings was conducted in a normal tone of voice, just outside the office where appellee had been asked to wait.
After this conversation, Officer Minor, in police uniform, went in to speak to appellee, who was alone in the office where he had been placed. The room measured about twelve by fourteen feet and had a desk and chairs. The two vials of marijuana that had been discovered by Mr. Rawlings were on the desk, within feet from appellee. As Officer Minor stepped into the office, he paused, looked down at the vials, and then asked, "What happened?," to which appellee immediately replied, "those two vials are mine, the two other guys got the other six, they are mine officer." Officer Minor left the room, and called for a crime scene officer, who tested the material in the vials and confirmed that it was marijuana. Officer Minor then placed appellee under arrest. He was thereafter charged with possession of marijuana.
Appellee brought a motion to suppress the statement he made to Officer Minor. Specifically, he argued that he was in custody when Officer Minor asked him "what happened?," and because the officer had *253 not issued Miranda warnings, the statement was taken in violation of his Fifth Amendment right against compelled self-incrimination. After hearing testimony from Officer Minor, the trial court ruled that appellee was in custody when the statement was made, and therefore it was inadmissible in the government's case-in-chief.[2] Upon the government's request for a two-week continuance to reassess the case, the judge dismissed the charge against appellee for want of prosecution. In its appeal, the government challenges the judge's ruling suppressing the statement.[3]

II.

Jurisdiction
As an initial matter, appellee has challenged our jurisdiction to hear this appeal. The jurisdictional challenge stems from the specific sequence of events discussed above, where the trial judge suppressed the challenged statement and only moments later dismissed the charges against appellee for want of prosecution. Without making any further filings in the Superior Court, the government filed a notice of appeal challenging the trial judge's suppression of appellee's statement to Officer Minor.
"Government appeals in criminal cases, long disfavored, are possible only pursuant to express statutory authority." District of Columbia v. McConnell, 464 A.2d 126, 127 (D.C.1983). Under D.C.Code § 23-104(a)(1), the District of Columbia or the United States "may appeal an order, entered before the trial of a person charged with a criminal offense, which directs the return of seized property, suppresses evidence, or otherwise denies the prosecutor the use of evidence at trial." The statute includes a procedural requirement that "the United States Attorney or the [Attorney General for the District of Columbia] conducting the prosecution for such violation certif[y] to the judge who granted such motion that the appeal is not taken for purpose of delay and the evidence is a substantial proof of the charge pending against the defendant." Id. The government's ability to appeal a pretrial order under § 23-104(a)(1) is conditioned on compliance with the terms of the statute. See McConnell, 464 A.2d at 128.
Appellee seizes on the language of the last sentence of § 23-104(a)(1)  that there be a "charge pending against the defendant"  and premises his jurisdictional challenge on the notion that once the trial judge dismissed the charges, there was no "charge pending" at the time appeal was taken, and therefore this appeal falls outside the narrow scope of § 23-104(a)(1). Although appellee's argument finds support in the text of the statute, cases construing this provision hold that even though charges have been dismissed, the government may appeal the suppression of evidence if there is the possibility that the government will again seek to prosecute the accused if the evidence is held to be admissible. See United States v. Cefaratti, *254 91 U.S.App.D.C. 297, 202 F.2d 13 (1952). In Cefaratti, after the trial court held that some evidence that had been seized was inadmissible, the government sought dismissal of two of four charged counts, and, following the acquittal on the remaining two counts, appealed the suppression order. See id. at 14. The court held that "the appeal is not moot" because, "if this [suppression] order is reversed before the statute of limitations runs, the government plans to reindict the appellee and try him." Id. We have relied on Cefaratti to allow government appeals where the charges against the defendant have been dismissed, but there still exists the possibility of charges being brought anew should the suppressed evidence be held to be admissible on appeal. See United States v. Hunter, 692 A.2d 1370, 1374 n. 3 (D.C.1997) (holding that even though the indictment had been dismissed "the government proposes to seek a new indictment, ... and the case is not moot"); United States v. Oliver, 297 A.2d 778, 780 (D.C.1972).
The charges against appellee are subject to a three-year statute of limitations, see D.C.Code § 23-113, and therefore the government is free to re-charge the defendant at any point before April 2006. The government represents that it intends to do so if the statements at issue are admissible. Accordingly, under the Cefaratti line of cases, this court has jurisdiction, notwithstanding the fact that there currently are no "charges pending" against appellee.
Appellee also argues that this court lacks jurisdiction because the government did not "certif[y] to the judge who granted such motion that the appeal is not taken for purpose of delay and the evidence is a substantial proof of the charge pending against the defendant" as required by § 23-104(a)(1). Specifically, appellee maintains that because this representation was made in the notice of appeal, and not in any filing to the trial judge, the government has not complied with the terms of the statute.[4]
As appellee concedes, this requirement in the statute is not jurisdictional in nature. Indeed, this court has previously rejected arguments "to strictly construe the certification requirement imposed by § 23-104(a)(1) against the government," United States v. Jackson, 441 A.2d 937, 939 (D.C.1982), and held that the certification "is not subject to attack so as to defeat the appeal." Id. (holding that court had jurisdiction over government's appeal of pretrial suppression of evidence, even though United States Attorney did not make required certification); see also In re F.K., 768 A.2d 1018, 1020 n. 5 (D.C.2001) (holding that court had jurisdiction to consider merits of appeal, even though certification required by § 23-104(a)(1) was made in government's notice of appeal, and not to trial judge). Given that the suppressed evidence is substantial proof of the charge and that the government represents that it intends to charge appellant again if the evidence is held to be admissible, there has been substantial compliance with the certification requirement.
Accordingly, this court has jurisdiction to consider the substantive issue in this appeal: whether appellee was in custody when questioned by the police officer.[5]

*255 III.

A. Fifth Amendment Right Against Self-Incrimination
Under the Fifth Amendment, a criminal defendant enjoys the right not to be compelled to be a witness against himself. U.S. CONST., amend. V. In 1966, the Supreme Court spurned decades of cases which evaluated, on an ad hoc basis, whether proffered criminal confessions were obtained in violation of this fundamental right, and held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda, 384 U.S. at 444, 86 S.Ct. 1602. Ever since, statements by criminal defendants that are the product of interrogation while the suspect is in custody have been inadmissible in the absence of the prophylactic warnings required under Miranda, which inform criminal defendants of various constitutional rights.[6] In Dickerson v. United States, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), the Supreme Court reiterated the constitutional mandate underlying Miranda. Id. at 444, 86 S.Ct. 1602.
The Fifth Amendment does not protect against all self-incrimination, but rather against any compelled self-incrimination. Thus, Miranda focused upon the pressure inherent in the "incommunicado interrogation of individuals in a police-dominated atmosphere," 384 U.S. at 445, 86 S.Ct. 1602 and sought to ameliorate the effects of that pressure on interrogation which occurs after "a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. at 444, 86 S.Ct. 1602.
"Custody," for Miranda purposes, is present when there has been a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam), quoted in In re E.A.H., 612 A.2d 836, 838 (D.C.1992); see *256 Resper v. United States, 793 A.2d 450, 456 (D.C.2002). As the court has explained
two discrete inquiries are essential to the [custody] determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve "the ultimate inquiry": "[was] there a `formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam) (quoting [Oregon v.] Mathiason, 429 U.S. [492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) ]). The first inquiry, all agree, is distinctly factual.... The second inquiry, however, calls for application of the controlling legal standard to the historical facts. This ultimate determination, we hold, presents a "mixed question of law and fact" qualifying for independent review.
Thompson v. Keohane, 516 U.S. 99, 112-13, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995).
Thus, custody requires an inquiry into whether "given [the] circumstances, [ ] a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." Id. at 112, 116 S.Ct. 457 quoted in Yarborough v. Alvarado, 541 U.S. 652, 663, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004); see Alvarado, 541 U.S. at 669, 124 S.Ct. 2140 (querying whether there is a "likelihood that the suspect would feel free to leave") (O'Connor, J., concurring); id. at 669-70, 124 S.Ct. 2140 ("Would a `reasonable person' in [the suspect's] position have felt he was `at liberty to terminate the interrogation and leave?'") (Breyer, J., joined by Stevens, Souter and Ginsburg, JJ., dissenting) (quoting Thompson, 516 U.S. at 112, 116 S.Ct. 457; Stansbury v. California, 511 U.S. 318, 325, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994)). However, in light of the framework for analysis set out in Thompson, this inquiry, though necessary, is not sufficient. See United States v. Newton, 369 F.3d 659, 670 (2d Cir.2004) ("The free-to-leave inquiry constitutes a necessary, but not determinative, first step in establishing Miranda custody."). If a reasonable person would have thought he was free to leave, "the Miranda inquiry is at an end...." Id. at 672. But "if a reasonable person would not have thought himself free to leave, additional analysis is required because, as Berkemer v. McCarty, 468 U.S. [420], 439-40, 104 S.Ct. 3138, 82 L.Ed.2d 317 [(1984)], instructs, not every seizure constitutes custody for purposes of Miranda." Id. The "ultimate inquiry [is] was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Alvarado, 541 U.S. at 663, 124 S.Ct. 2140 (quoting Thompson, 516 U.S. at 112, 116 S.Ct. 457).
In evaluating whether a person was in custody, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); Alvarado, 541 U.S. at 662, 124 S.Ct. 2140 ("[C]ustody must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances.") In determining whether a suspect is in custody, the court is to consider the totality of the circumstances, and "must be informed by the underlying purpose of the Miranda rule, namely to protect individuals from compelled self-incrimination." Id. (quoting United States v. Turner, 761 A.2d 845, 851 (D.C.2000)).

*257 B. Fourth Amendment Seizures and Fifth Amendment Custody
The government argues that Officer Minor's questioning occurred within the scope of a Terry[7] stop because his question was a quick on-the-spot action intended to confirm his "reasonable suspicions" as to the appellant's criminal conduct, and that Terry stops are non-custodial for Fifth Amendment purposes. Appellee, on the other hand, contends that this encounter "exceeded the scope of a Terry stop" because Officer Minor "already had enough evidence to give him probable cause to arrest I.J. He did not need to question I.J. or to field-test the marijuana in order to develop probable cause to arrest." We find it unnecessary to decide the question, because even if appellee's seizure was a permissible Terry stop, the Fourth Amendment inquiry is not the same as, nor does it ultimately decide, the question of whether there was custody under the Fifth Amendment.
Although Miranda's protections generally do not apply to questioning which occurs during Terry seizures,[8]see Berkemer, 468 U.S. at 439-40, 104 S.Ct. 3138; Resper, 793 A.2d at 458; McIlwain v. United States, 568 A.2d 470, 472-73 (D.C. 1989), "experience demonstrates that the reach of Miranda is sometimes blurred in circumstances involving a Terry encounter," Miley v. United States, 477 A.2d 720, 722 (D.C.1984), and that "the parameters of the terms, `custody' and `arrest' may change with the context." Id. Thus, although an encounter between the police and a suspect may not necessarily be deemed an arrest  requiring probable cause  within the meaning of the Fourth Amendment, the same encounter may nevertheless be custodial and require Miranda warnings when assessed against the different goals of the Fifth Amendment. In other words, the fact that an encounter may be a reasonable seizure within the scope of Terry for Fourth Amendment purposes does not automatically and necessarily remove it from Miranda's Fifth Amendment protections. This is primarily because the Fourth Amendment's ultimate focus is on the reasonableness of police conduct in detaining a person, while, in the Fifth Amendment analysis, the guiding inquiry is directed to "how a reasonable person in the suspect's situation would perceive his circumstances," Alvarado, 541 U.S. at 662, 124 S.Ct. 2140 because the overarching value is the protection of the privilege against compelled self-incrimination safeguarded by Miranda warnings.
In Terry, the court approved brief investigatory stops, based on a police officer's reasonable articulable suspicion that a person may be involved in criminal activity. 392 U.S. at 22, 88 S.Ct. 1868. Terry held that the stop must be "reasonably related in scope to the justification for [its] initiation," id. at 29, 88 S.Ct. 1868 and we have previously noted that a "trend [in expanding the scope of Terry] has led to permitting the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest than *258 with investigatory detention." Hicks v. United States, 730 A.2d 657, 660 (D.C. 1999). While we do not retreat from our holding in Hicks, and stand with the various federal circuits which have held that the use of relatively intrusive precautionary restraints will not necessarily take an encounter outside of Terry's ambit, see United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir.1993) (collecting numerous cases), we do note that this trend has re-defined
the typical police-citizen encounter envisioned by the Court in Terry [which] usually involve[d] no more than a very brief detention without the aid of weapons or handcuffs, a few questions relating to identity and the suspicious circumstances, and an atmosphere that is "substantially less police dominated than that surrounding the kinds of interrogation at issue in Miranda." Berkemer, 468 U.S. at 439, 104 S.Ct. 3138.
Id. at 1464. Thus, as the scope of police actions considered "reasonable" Terry stops under the Fourth Amendment is expanded, automatic reliance on the presumed overlap between the Fourth and Fifth Amendments may not be an adequate substitute for a focused inquiry on whether police actions render the encounter custodial for purposes of the Fifth Amendment. See, e.g., id. at 1465 (holding that although police actions did not constitute an arrest within the meaning of the Fourth Amendment, the encounter was nonetheless custodial for Miranda purposes); United States v. Smith, 3 F.3d 1088, 1097 (7th Cir.1993) (holding that although the encounter stayed within the scope of a Terry stop, it was custodial within the meaning of the Fifth Amendment); United States v. Bautista, 684 F.2d 1286, 1291 (9th Cir.1982) ("Miranda warnings are necessary even during a Terry stop if the suspect has been taken into custody or if the questioning otherwise takes place in a police dominated ... atmosphere.").[9]
This distinction is based on the different interests which the two amendments safeguard, and the respective inquiries undertaken in determining whether their constitutional guarantees have been violated. The Fourth Amendment's prohibition on unreasonable seizures protects persons from being detained by the police without adequate justification. Its protections, therefore, will bend to accommodate the public's interest in effective on-the-scene investigative work, provided that the detention is brief, and only as invasive as required by the circumstances. See, e.g., Terry, 392 U.S. at 29, 88 S.Ct. 1868. Although whether there has been a "seizure"  determined by reference to whether "a reasonable person would have believed that he was not free to leave," United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), quoted in Harris v. United States, 738 A.2d 269, 275 (D.C.1999); is a necessary predicate for application of the Fourth Amendment, the ultimate inquiry undertaken in analyzing such a detention for compliance with the Fourth Amendment is whether the officer's actions are objectively reasonable. See Terry, 392 U.S. at 19-20, 88 S.Ct. 1868. Thus, the Fourth Amendment permits a range of police action measuring the reasonableness of the infringement on personal liberty  mere seizure or arrest  against the *259 quality of the information giving rise to the police intervention  reasonable articulable suspicion or probable cause.
The Fifth Amendment, on the other hand, shields a person who has been identified as a suspect from compelled self-incrimination, and places a much higher value on the individual right at stake than on the needs of law enforcement. See Miranda, 384 U.S. at 460, 86 S.Ct. 1602 ("To maintain a `fair state-individual balance,' to require the government `to shoulder the entire load,' to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth.") (citing Chambers v. Florida, 309 U.S. 227, 235-238, 60 S.Ct. 472, 84 L.Ed. 716 (1940); other citations omitted).[10] The Court has long recognized that because there is inherent compulsion when a person is in police custody, absent procedural safeguards, any statement that is the product of custodial interrogation is taken in violation of the Fifth Amendment. See id. The custody inquiry  "based on how a reasonable person in the suspect's situation would perceive his circumstances," Alvarado, 541 U.S. at 662, 124 S.Ct. 2140  is dispositive in the Fifth Amendment in a way that it is not in the context of the Fourth. The answer to that question determines whether the Fifth Amendment privilege against compelled self-incrimination will prohibit the government from using a statement obtained by interrogating a suspect without Miranda warnings; whether the police's tactics were reasonable is not the preoccupation of the Fifth Amendment. See United States v. Ali, 68 F.3d 1468, 1473 (2d Cir.1995) ("[W]hether the `stop' was permissible under Terry v. Ohio ... is irrelevant to the Miranda analysis. Terry is an `exception' to the Fourth Amendment probable cause requirement, not to the Fifth Amendment protections against self-incrimination.").
Thus, even though the analysis under both Amendments involves the subject's reasonable perception of his or her situation, because the goals of the two Amendments and their respective ultimate inquiries are different, police conduct that may satisfy Terry does not necessarily meet the requirements of Miranda.[11] *260 Should the circumstances so dictate, a person may be seized  stopped, frisked, handcuffed, detained, transported in a police vehicle to another location (including a police station) and briefly questioned  so as to allow a Terry investigation on reasonable articulable suspicion without the encounter being deemed an arrest, within the meaning of the Fourth Amendment, requiring probable cause. However, if the same tactics that may be permitted by the Fourth Amendment would cause a reasonable person in the suspect's situation to believe that his freedom of action has been curtailed to a degree associated with formal arrest, see Beheler, 463 U.S. at 1125, 103 S.Ct. 3517 there is custody that triggers the additional protections of the Fifth Amendment. Thus, where the overall tenor of the situation would cause a reasonable person to believe he or she is under arrest, the fact that the police are undertaking such actions to make an on-the-spot confirmation of their suspicions is not a talisman to be invoked so as to take the encounter outside Miranda's scope. When an encounter becomes dominated by police authority, the Fourth Amendment of the Constitution may not operate to prevent the investigation, but the Fifth Amendment may require that "officers must make a choice  if they are going to take highly intrusive steps to protect themselves from danger, they must similarly provide protection to their suspects by advising them of their constitutional rights." Perdue, 8 F.3d at 1465.
Judicial review of a police encounter with a suspect must focus on the situation in its entirety and include not only what the police do but also what they say. Communications from the police to the suspect, in particular, may assuage the reasonable person's assessment of the situation, and militate against a finding of custody. For example, where the police specifically inform the suspect that she or he is not under arrest, and does not need to talk to the police, a stop for investigatory purposes is unlikely to be custodial even if some form of restraint is imposed. See Resper, 793 A.2d at 454 (holding there was only a Terry stop, but no custody, even though the suspect was frisked and driven to the police station in the back of a police vehicle, because the suspect was advised he was not under arrest and went with police voluntarily); McIlwain, 568 A.2d at 472-73 (holding that suspect was not in custody, even though confined to his room by police, where he was told that he was not under arrest and did not have to speak with the police). See also United States v. Griffin, 7 F.3d 1512, 1518 (10th Cir.1993) ("[T]he lack of a police advisement that the suspect is at liberty to leave is a significant indication of a custodial detention."). Cf. Alvarado, 541 U.S. at 665, 124 S.Ct. 2140 (factor indicative of custody is that officer "did not tell [suspect] that he was free to leave"); id. at 676, 124 S.Ct. 2140 (noting importance of "what the officer communicated to the individual during interrogation (that he was a suspect? That he was under arrest? That he was free to leave at will?)") (Breyer, J., dissenting).
On the other hand, certain aspects of seizures which may be consistent with a Terry stop, such as transporting the suspect to another location or conducting an interview at a police station, may imply elements of compulsion that make the encounter custodial depending on how a reasonable person would view the circumstances. See id. at 663, 124 S.Ct. 2140. This court has noted
a sharp distinction between those circumstances where an interrogation is exposed to public view, such as a traffic stop or other circumstance where the ability of the unscrupulous policeman to use illegitimate means to elicit self-incriminating *261 statements is reduced, and those circumstances where interrogations take place in `police dominated surroundings' similar to the interrogation at issue in Miranda.

Turner, 761 A.2d at 852. Thus, "what most concerns the court is police-dominated questioning that is away from the public view." Id. Even an investigation which has as its purpose and scope an expedient confirmation or dispelling of suspicion  that is, a Terry encounter  may therefore give rise to the need for warnings when the overall atmosphere and location of the interrogation produces the pressures Miranda is designed to counter. See id. Thus, it is relevant whether an officer confirming his investigatory leads did so in an area which was "on the street," or at the scene of the crime, or rather did so after removing the suspect to a secluded area, or one in which there is evident police domination.
Additionally, the guiding justification for Terry  the need to permit immediate police investigation, by allowing officers to follow-up on their reasoned suspicions even when they lack the requisite probable cause to justify an arrest  is lacking when the officers already have sufficient cause to arrest, and this is known to the suspect. See Miley, 477 A.2d at 722. Thus, this court has held that what otherwise would be a permissible Terry stop should be deemed an arrest, necessitating Miranda warnings, when the suspect is "confronted with the obvious evidence of guilt." Id. Because Miranda's focus is on the perceptions of the reasonable person, see Berkemer, 468 U.S. at 442, 104 S.Ct. 3138 it is necessary to recognize that a suspect would reasonably believe that the police intend to arrest him because the police have evidence against him.
In sum, although we recognize that in many instances  perhaps most  a brief investigative Terry stop deemed reasonable under the Fourth Amendment will not trigger the protections of the Fifth Amendment, we reject the view that the two issues are the same, and that the answer to one also answers the other. The facts and circumstances that justify an encounter as a permissible Terry stop for Fourth Amendment purposes will not necessarily dispose of the related  but different  question of whether there is custody within the meaning of Miranda under the Fifth Amendment. With respect to the latter inquiry, the actions and words of the police must be evaluated in context to determine whether there was any show of authority or other message conveyed which would cause the suspect to reasonably think he or she was not free to terminate the questioning and leave and that his or her freedom was being restrained to "the degree associated with a formal arrest." Beheler, 463 U.S. at 1125, 103 S.Ct. 3517. That evaluation must be undertaken from the perspective of what a reasonable person would believe, given the overall tenor of the situation. See Berkemer, 468 U.S. at 442, 104 S.Ct. 3138. When a reasonable person would believe that his or her freedom has been restrained as in a formal arrest, that person is in custody for Fifth Amendment purposes, regardless of the reasonableness of the basis for or scope of the interview conducted by the investigating officer, as measured under the Fourth Amendment.

IV.
Applying these principles, we turn to consider whether appellee was in police custody when questioned, and conclude that he was.
The determination whether a suspect was in police custody presents a mixed question of fact and law. This court will defer to the trial court's findings of *262 fact, but will evaluate de novo whether, on those facts, the person was in custody. See In re E.A.H., 612 A.2d at 838. In this case the facts are undisputed, and the question is a legal one. In determining whether appellee was in custody, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Berkemer, 468 U.S. at 442, 104 S.Ct. 3138. This determination considers the totality of the circumstances, and is "informed by the underlying purpose of the Miranda rule, namely to protect individuals from compelled self-incrimination." Turner, 761 A.2d at 851. When questioned by Officer Minor, appellee was in a room, where he had been directed by a staff member of the Kennedy Youth Center, where he resided pursuant to court order pending revocation of his probation in another case. He was placed in the room after he had admitted to possessing marijuana and the marijuana found under his bed was on the table in front of him. Appellee knew that before the police officer came into the room, he had been briefed by the staff of the youth center who had found the marijuana.
Several factors in appellee's situation weigh in favor of a finding that he was in custody. He was confined in a room until the officer arrived, in a youth center  an environment with considerable overtones of authority and control. The parties offer differing views on how appellee's status as a probationary resident of the youth center should inform the custody analysis. Appellee compares his status to that of a prisoner because he was compelled to reside there by court order, and his situation therefore dominated by state power. See, e.g., Whitfield v. State, 287 Md. 124, 411 A.2d 415, 426 (1980) (finding inmate in custody when taken to an isolation wing for questioning). The government, on the other hand, emphasizes that the youth center was appellee's home, from which he attended school and other activities, and compares the encounter here to those in a suspect's home, where the familiar environment is considered to reduce the coercive pressure of police presence. See, e.g., McIlwain, 568 A.2d at 472 (finding, as a factor militating against custody, that encounter took place in suspect's home). We find neither comparison is apt. Instead, we consider that appellee's situation in the youth center lies somewhere between the two, and is more analogous to that of a student summoned to a private office at his or her school to meet with a police officer  although we recognize that as a placement pursuant to the court's disposition of a juvenile case, the youth center's environment was likely more coercive than that of a school.[12] Using this analogy, the analysis of other jurisdictions is helpful in *263 informing our decision that appellee was in police custody when he was placed in the private office of the youth center to await the arrival of the police.
A frequently-cited case in this area of the law is In re Killitz, 59 Or.App. 720, 651 P.2d 1382 (1982), involving a juvenile suspect who was summoned to the principal's office at his high school, during school hours, where he was questioned by a police officer. See id. at 1383. The Killitz court focused on the fact that the school used its disciplinary powers to usher the student into the police interview, and, in the absence of mitigating factors, found that the interview was custodial within the meaning of Miranda. See id. at 1384.[13]Killitz has been cited, and followed, by numerous courts for the proposition that when a student is in school, and is compelled by school authorities to leave his normal classroom setting to speak with the police in a private location, the interview is custodial within the meaning of Miranda.[14]
Unlike the cases where we have found that custody was not present despite significant displays of police authority, in this case there were no words or actions on the part of the officer to mitigate the compulsive atmosphere. See McIlwain, 568 A.2d at 472-73 (holding that suspect was not in custody, even though confined to his room by police, where he was told that he was not under arrest and did not have to speak with police); see also State v. Budke, 372 N.W.2d 799, 801 (Minn.Ct.App.1985) (finding *264 no custody where eighteen-year-old suspect informed by interrogating officer that he was free to leave the principal's office at any time); In re Loredo, 125 Or.App. 390, 865 P.2d 1312, 1313-14 (1993) (distinguishing Killitz, and holding that student not in custody because officer informed the child that he was not under arrest, could leave at any time, and did not have to answer any questions); cf. Griffin, 7 F.3d at 1518 (holding that detention was custodial; "[t]he lack of a police advisement that the suspect is at liberty to decline to answer questions or free to leave is a significant indication of a custodial detention"). Nor was there a protective adult or parental presence that, arguably, could have served to mitigate the coercive environment.[15]Compare Alvarado, 541 U.S. at 665, 124 S.Ct. 2140 (noting that exclusion of parents from interview might reasonably make suspect "feel more restricted than otherwise") with id. at 671, 124 S.Ct. 2140 (suggesting that parents' involvement in bringing suspect to police station suggests that suspect's presence is involuntary) (Breyer, J., dissenting). The interrogation took place not on the scene and in public, but in a private office away from public view. See Turner, 761 A.2d at 852 ("[W]hat most concerns the court is police dominated questioning away from the public view."). Moreover, the marijuana had been brought into the office and "confronted with the obvious evidence of guilt, [appellee] could reasonably have assumed that he would not be allowed to leave." Miley, 477 A.2d at 722.
We conclude that a reasonable person in appellee's situation would have believed that his freedom was being restrained to "the degree associated with a formal arrest." Beheler, 463 U.S. at 1125, 103 S.Ct. 3517. Therefore, there was custody for Fifth Amendment purposes.

V.
The second precondition for Miranda warnings, interrogation, was also present. Interrogation, for Miranda purposes is defined as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The Innis focus is a subjective one, extending "to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." Id. at 302, 100 S.Ct. 1682 (emphasis in original). In determining whether a query on the part of the investigating officer rises to the level of interrogation, the focus is not merely on the language employed by the officer, but the factual context in which it was spoken. See In re E.G., 482 A.2d 1243, 1247-48 (D.C.1984).
In this case, after having been called by and consulted with the youth center staff about the morning's events, Officer Minor asked appellee "what happened?" immediately upon entering the room where he was detained. Although we have previously held that police statements such as "do you know why I'm here," Robertson v. United States, 429 A.2d 192, 193 (D.C. 1981), and "what happened," McIlwain, 568 A.2d at 472, do not constitute interrogation for Miranda purposes, in those cases we took account of the investigatory, non-custodial context in which the questions *265 were posed, and held that viewed in context, they were not designed to elicit incriminating responses. In this case, on the other hand, Officer Minor confronted appellee, while in custody, with damning evidence of guilt close by, and fully aware that appellee knew he had already "let the cat out of the bag" by giving a previous incriminating statement to Mr. Rawlings. In such a situation, the officer "should have known" that his question was "reasonably likely to elicit an incriminating response." See E.G., 482 A.2d at 1248 ("[T]here was no understandable explanation for [the officer's] rhetorical question other than to elicit a response from appellant. It is precisely this type of tactic, following on the heels of a statement confronting the suspect with purported tangible evidence of a crime, which is prohibited by Miranda."). That appellee quickly and candidly admitted that the drugs were his  in other words, that his statements were voluntary in fact  is irrelevant to the Fifth Amendment's inquiry designed to further Miranda's prophylactic purpose once custody has been established. Therefore, appellee's statements in response were the product of police interrogation.

VI.
In conclusion, because appellee was in police custody when he made statements in response to police interrogation without benefit of the warnings required by Miranda, the statements must be suppressed.
Affirmed.
NOTES
[*] This opinion was originally issued on October 13, 2005. See In re I.J., 884 A.2d 611 (D.C. 2005). Upon consideration of appellant's petition for rehearing, this opinion is being reissued in amended form.
[**] At the time the briefs were filed, Ms. Anderson and Ms. Groce were called Assistant Corporation Counsel and Messrs. Spagnoletti, and Schwab were called Corporation Counsel, and Deputy Corporation Counsel, respectively. Since that time, however, the Mayor of the District of Columbia has issued an executive order re-designating the Office of Corporation Counsel as the Office of the Attorney General for the District of Columbia. See Mayoral Order No.2004-92, 51 D.C.Reg. 6052 (May 26, 2004) (citing D.C.Code § 1-204.22(2) & (11) (2001)). We therefore employ the titles applicable at the time of this opinion's publication.
[1] See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] The trial court also found that the confession was voluntary and did not offend any due process concerns, and therefore was admissible as rebuttal evidence. See Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).
[3] Appellee did not move to suppress the marijuana seized from his belongings or the incriminating statement he made to Mr. Rawlings. The District did not, however, argue in the trial court that it was ready to proceed because there was sufficient evidence even without the statement to Officer Minor that was suppressed. On appeal, the District does not challenge the judge's dismissal of the case for lack of prosecution.
[4] In the government's notice of appeal, the last line before the attorney's signature states, "I hereby certify that the appeal is not taken for the purpose of delay and the evidence is substantial proof of the Charge pending against the defendant."
[5] Appellee raises for the first time on appeal an alternative ground for affirmance: that his confession must be suppressed because it was obtained in violation of Superior Court Juvenile Rule 105(e), which provides that "no person shall be permitted to interview a respondent held in the [shelter or detention] facility without the respondent's parent, guardian, custodian or attorney being present, unless the parent, guardian, custodian or attorney has been informed of the purpose of the interview and has given written permission for the interview to be held without her or him." Super. Ct. Juv. R. 105(e)(1). The application of Rule 105(e) to the facts of this case depends on whether Mr. Rawlings may be deemed to be a "custodian" of the appellee, see D.C.Code § 16-2301(12)(A) (defining "custodian" as one "to whom the legal custody of a child has been granted by the order of a court"), and if so, whether he was present during the interview or gave written permission that it be held without him. Although we recognize that a trial court judgment may be affirmed on an alternative ground, it must be supported by the record on appeal. See Carr v. Rose, 701 A.2d 1065, 1077 n. 29 (D.C. 1997). As the argument under Rule 105 was not made in the suppression motion, the trial judge did not make the fact findings that would have been required to evaluate compliance with the rule. Therefore, despite our usual reluctance to consider constitutional issues where resolution of the case may be achieved on non-constitutional grounds, see Gay Rights Coal. v. Georgetown Univ., 536 A.2d 1, 16 (D.C.1987) (en banc), the Rule 105(e) claim has not been sufficiently preserved so as to allow this court to undertake a proper review, and we therefore address the Fifth Amendment issue.
[6] Specifically, interrogating officers must inform the suspect (1) that he or she has the right to remain silent; (2) that any statement which he or she makes may be used by the government in the ensuing prosecution; (3) that he or she has the right to have an attorney present during questioning; and (4) that an attorney will be provided if the suspect is unable to afford one. See Miranda, 384 U.S. at 444, 86 S.Ct. 1602.
[7] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[8] The questioning permitted by Terry has been compared to the brief, non-invasive search of the person also approved of in that decision. See Note, Custodial Engineering: Cleaning Up the Scope of Miranda Custody During Coercive Terry Stops, 108 HARV.L.REV. 665, 673 (1995) ("The `verbal frisk,' like its physical counterpart, has a limited purpose: to confirm or dispel the particular suspicions of the officer making the stop. Unlike a typical custodial interrogation, in which a party may face a wide-ranging barrage of questions with no prospect of relief, a Terry inquiry must be pointed and brief.").
[9] At least one commentator has noted that the expansive view of what procedures are proper during a Terry stop has led to difficulty in fashioning a bright line which would clearly separate Terry encounters from those requiring Miranda warnings. See Mark A. Godsey, When Terry Met Miranda: Two Constitutional Doctrines Collide, 63 FORDHAM L.REV. 715, 716 (1994).
[10] The Fifth Amendment rights of the individual give way to the needs of law enforcement only when the latter is at its zenith. Cf. New York v. Quarles, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (holding that statements taken without proper warnings in exigent circumstances are admissible when taken to protect the public's safety). Moreover, the exclusionary rule as applied to the Fifth Amendment may yield to the need to preserve the truth-seeking function of a criminal trial by permitting unwarned statements to be used to impeach a defendant who has chosen to take the stand. See Harris, 401 U.S. at 226, 91 S.Ct. 643.
[11] The use of similar terms, for example, whether the suspect reasonably considers himself to be "under arrest" or "feels free to leave," to determine whether there is seizure and custody, has contributed to the blurring of the separate analyses and purposes of the Fourth and Fifth Amendments. Moreover, we have on occasion said that, for purposes of the Fifth Amendment, "custody is clearly more than seizure alone." Turner, 761 A.2d at 851; Harris, 738 A.2d at 275 ("Custody, possibly implicating Fifth Amendment concerns, requires more than a seizure."). These comments, taken in context, are shorthand references to the brief investigative "stop and frisk" detention in Terry, not to the lengthier and more intrusive police detentions for investigation of more recent vintage that have been given Fourth Amendment sanction in recognition of the "reasonable" safety needs of law enforcement as they confront the real-world risks inherent in law enforcement.
[12] Because the analogy to a school setting subsumes the fact that I.J. was of school age, we do not separately take his youth into account. The Supreme Court has not definitively ruled on whether a suspect's youth is part of the objective Miranda custody analysis. See Alvarado, 541 U.S. at 668, 124 S.Ct. 2140 (concluding in a habeas petition of state court conviction that state court's failure to consider the suspect's age is not "an unreasonable application of clearly established law"); id. at 669, 124 S.Ct. 2140 (noting that age may be relevant to custody inquiry, but not in case of a 17½ year old because it is "difficult to expect police to recognize that a suspect is a juvenile when he is close to the age of majority" and "to ascertain what bearing it has on the likelihood that the suspect could feel free to leave") (O'Connor, J., concurring); id. at 676, 124 S.Ct. 2140 ("Common sense, and an understanding of the law's basic purpose in this area, are enough to make clear that [the suspect's] age  an objective, widely shared characteristic about which the police plainly knew  is also relevant to the inquiry.") (Breyer, J., joined by Stevens, Souter, Ginsburg, JJ. dissenting); cf. In re J.M., 619 A.2d 497, 503 (D.C.1992) (age considered in determining whether juvenile had consented to search).
[13] Various courts have come to similar conclusions when analyzing whether a police interview of an adult was custodial when conducted in a secluded location at the suspect's workplace. See, e.g., United States v. Carter, 884 F.2d 368, 370 (8th Cir.1989) (holding that a bank employee suspected of stealing certain items from the bank mail room was in custody when summoned from his normal work location and interviewed in the bank president's office by investigators); cf. United States v. Dockery, 736 F.2d 1232, 1234 (8th Cir.1984) (finding suspect not in custody when summoned to a small, vacant office at bank where she worked, because she was informed by the investigating FBI agents that she was not under arrest, did not have to answer any questions, and was free to leave at any time); Griffin, 7 F.3d at 1519 (holding suspect not in custody during brief initial questioning during which she was told she was not under arrest and was free to leave, though her subsequent removal to an interview room for further questioning was custodial).
[14] See, e.g., In re D.A.R., 73 S.W.3d 505, 512 (Tx.Ct.App.2002) (holding that child was in custody when he had initially been questioned by the school's assistant principal, had returned to class, and was then summoned back to the school office to speak with investigating officer); In re Doe, 130 Idaho 811, 948 P.2d 166, 174 (Idaho Ct.App.1997) (holding that Miranda warnings were required when child suspect was removed from class to speak with two police officers in closed room adjoining the principal's office); In re G.S.P., 610 N.W.2d 651, 659 (Minn.Ct.App.2000) (holding that student was in custody, when questioned by principal and police officer in principal's office, and not informed that he was not under arrest and did not have to answer any questions); In re L.M., 993 S.W.2d 276, 290 (Tx.Ct.App.1999) (holding that child suspect in custody when interviewed by investigating officers in separate room in the offices of the juvenile shelter where she was placed after being arrested for offense at issue); In re T.J.C., 662 N.W.2d 175, 181 (Minn.Ct.App. 2003) (holding that ten-year-old suspect was in custody when summoned from his classroom to principal's office for police interview), rev'd on other grounds, 667 N.W.2d 108 (Minn.2003); State v. D.R., 84 Wash.App. 832, 930 P.2d 350, 353 (1997) (holding that juvenile suspect was in custody when summoned to assistant principal's office and interviewed by plain clothes officer, because "a reasonable 14-year-old in D.R.'s position would have reasonably supposed his freedom of action was curtailed"). But see Doe v. Bagan, 41 F.3d 571, 575 n. 3 (10th Cir.1994) (holding that even though nine-year-old suspect may not have felt free to leave, he was not in Miranda custody when interviewed by two social services workers in principal's office at school).
[15] Even assuming that Mr. Rawlings had been present during the questioning, see note 5, supra, he previously had personally confronted appellee with the drugs and was part of the staff at the youth center who summoned the officer. Therefore, it is unlikely that he would have been perceived as providing a shield from police coercion.