**In re A.J.**

**District of Columbia, Appellant.**

**No. 11–FS–644.**

District of Columbia Court of Appeals.

Argued Feb. 21, 2013.

Decided March 28, 2013.

John J. Woykovsky, Assistant Attorney General for the District of Columbia, with whom Irvin B. Nathan, Attorney General, Todd S. Kim, Solicitor General, and Rosalyn Calbert Groce, Deputy Solicitor General, were on the brief, for appellant.

Chessely A. Robinson for appellee.

Before THOMPSON and McLEESE, Associate Judges, and SCHWELB, Senior Judge.

SCHWELB, Senior Judge:

On March 16, 2011, the District of Columbia instituted a juvenile delinquency proceeding in which A.J., who was then fifteen years of age, was charged with unlawful possession of a BB gun. A.J.'s counsel filed a pretrial motion to suppress an oral statement in which A.J. admitted, in response to a single question from the officer who had detained him, that he (A.J.) had a BB gun on his person. A.J. also asked the court to suppress the weapon itself.

Following an evidentiary hearing, the trial judge rejected a claim by A.J., based on the Fourth Amendment, that the police had detained him without reasonable suspicion that he had committed a criminal offense, and that the evidence was therefore the product of an unconstitutional seizure. The judge held, however, that A.J.'s

incriminating statement was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and she granted A.J.'s motion to suppress the statement. The judge then added: "I think it would follow that the recovery of the BB gun would also be suppressed."[1] The District filed a petition for reconsideration, which the judge denied following a second hearing.[2]

The District now appeals, contending, *inter alia*, that A.J. was not in custody for *Miranda* purposes at the time that he made the statement, and that therefore there was no violation of *Miranda*. We conclude that on this record, no person of A.J.'s age, and in his circumstances, could reasonably have believed that he was under arrest or its equivalent. Accordingly, we agree with the District that A.J. was not in custody, and we therefore reverse.

## I.

### THE TRIAL COURT PROCEEDINGS

#### A. The evidence.

Officer Christopher Parsons of the Metropolitan Police Department was the sole witness at the hearing on A.J.'s motion. Parsons testified that at approximately 11.30 A.M. on March 15, 2011, a weekday, he was driving his vehicle in northwest Washington, D.C., when he saw A.J. and a companion crossing the street. Both young men appeared to be approximately fifteen or sixteen years old, and thus of school age and possible truants. Parsons stopped and spoke to the young men from inside his car. In response to a question from the officer, the teenagers stated that they were going up the street. Parsons then pulled up directly in front of A.J. and his companion, and he inquired why they were not in school. The young man who was with A.J. produced a document showing that he had been suspended from school, and he departed after Officer Parsons advised him that he was free to leave. *Id.*

Officer Parsons then turned to A.J., who told the officer that he was sixteen years old; that although he lived in the District, he attended school in Virginia; and that he was not at school on that day because of "transportation problems." A.J. gave Officer Parsons his parents' telephone number or numbers, but Parsons called and was unable to reach a parent. Parsons testified that in conformity with customary procedure, he could not let A.J. go without obtaining further information regarding whether A.J., who appeared to be under the age of sixteen, was a truant. Officer Parsons therefore told A.J. that since A.J. had said that he lived nearby, he (the officer) would try driving by A.J.'s father's house. Then, according to the officer,

> I advised him, well, we're going to go down to the house. We're going to go

---

1. In *United States v. Patane*, 542 U.S. 630, 636–37, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004), a divided Supreme Court held that the rule of *Miranda* does not require the suppression of physical evidence obtained by unwarned interrogation conducted in contravention of *Miranda*. Neither the trial judge nor trial counsel made any reference to *Patane*, and the decision likewise was not cited in either party's brief on appeal. In any event, our disposition is consistent with *Patane*, although the outcome of the appeal would be the same even if *Patane* had not been decided.

2. The District claimed at the second hearing, and continues to maintain in this court, that even if A.J. was in custody at the time that he was questioned, the evidence should not have been suppressed, citing the "public safety" exception to *Miranda* and the "inevitable discovery" doctrine. Because we hold that A.J. was not in *Miranda* custody, we do not reach these issues.

over to my car and I'm going to put him in the car. As I got to the back of the car, I asked him did he have anything on him I needed to know about. And he reached into his inside [jacket] pocket and said "yeah, I got this," and he pulled out a black BB gun.

Officer Parsons did not read A.J. his rights under *Miranda* prior to asking him the foregoing question.

On cross-examination, Officer Parsons acknowledged that A.J. was cooperative, and that there was no indication that A.J. was involved in any "nefarious criminal activity." When asked whether he had intended to search A.J., Parsons answered that "at some point in time, yeah, [A.J.] would have been patted down," because "before you put someone in the back of the transport, [you] pat them [sic] down. But before I patted him down, I asked him."

### B. The arguments of counsel and the trial court's ruling.

In his motion to suppress, A.J.'s attorney claimed that the stop of his client was unlawful, but he did not raise any issue under *Miranda*. At the hearing, however, in closing argument following the completion of Officer Parsons' testimony, he further contended that A.J.'s statement, as well as the weapon recovered from A.J. following that statement, should be suppressed on the authority of *Miranda*. Counsel argued in pertinent part as follows:

> [T]he officer stated that he did not Mirandize Mr. J. after he placed him under arrest. And placing him under arrest he clearly did. Clearly, Mr. J., or any reasonable person after being placed under arrest, *would not have a reasonable expectation of freedom to leave or free-*

*dom to move.* So clearly it was a custodial interrogation when he then asked him a question subsequent to that.

(Emphasis added.) A.J.'s attorney was asking the court, in other words, to rule that his client was entitled to a *Miranda* warning because a reasonable person in A.J.'s situation would not have felt free to leave. Counsel for the District responded, *inter alia*, that the detention of A.J. was an "investigatory stop," rather than an arrest or its equivalent, and that as in cases "talk[ing] about transporting someone briefly to a show-up, that [is] still an investigation,"[3] so that a *Miranda* warning is not required.

The trial judge granted A.J.'s motion, and she ordered suppression both of the statement and of the weapon. She held first that under the District's laws applicable to truancy, *see* D.C.Code §§ 16–2309 (Supp.2007), 38–202 (2009 Supp.), 38–251 (2009 Supp.), an officer is authorized to take into custody a child of school age if the officer has reasonable grounds to believe that the child is a truant, and that the initial detention of A.J. was therefore lawful. The judge ruled, however, that at the time that A.J. admitted, in response to police questioning, that he had a BB gun, A.J. was in custody, and that he was therefore entitled to the warnings required by *Miranda* before interrogation began. Because Officer Parsons had questioned A.J. without first advising him of his *Miranda* rights, the judge held that A.J.'s statement, as well as the BB gun, must be suppressed. The judge did not differentiate between "custody" as used in the truancy statutes and "custody" for *Miranda* purposes, nor did she address any difference between detention or seizure and cus-

---

**3.** Counsel was apparently referring to *In re M.E.B.*, 638 A.2d 1123 (D.C.1993), discussed     *infra.*

tody. The judge thus apparently accepted A.J.'s position that because, at the time A.J. made his statement, a reasonable person in A.J.'s position would not have believed that he was free to leave (which, in fact, A.J. was not), A.J. was in police custody within the meaning of *Miranda.*

## II.

## ANALYSIS

### A. The relationship between seizure and custody.

■ The historical facts relevant to whether A.J. was in custody for *Miranda* purposes when Officer Parsons posed his single question are undisputed, and the issue before us is thus one of law. We therefore review *de novo* the trial judge's ruling on that issue. *Watson v. United States,* 43 A.3d 276, 282 (D.C.2012); *In re E.A.H.,* 612 A.2d 836, 838 (D.C.1992). In our view, the judge erred by failing to distinguish between the relatively simple question whether, at the time the officer inquired if A.J. had anything on him, A.J. had been seized (which he indisputably had been), and the more complicated issue whether A.J. was also in custody as that term is used in *Miranda* and in the cases applying that decision. Because the undisputed evidence shows that at this point, A.J. had been detained but was not in *Miranda* custody, we must reverse.

■ "If the defendant is not in custody[,] then [*Miranda* and its progeny] do not apply." *Montejo v. Louisiana,* 556 U.S. 778, 795, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009). "For purposes of *Miranda,* we have distinguished between 'custody' and 'seizure,' recognizing that 'custody' is the more onerous of the two." *Castellon v. United States,* 864 A.2d 141, 152 (D.C. 2004) (citations omitted). Accordingly, "[e]ven if a reasonable person would not have thought himself free to leave, addi-

tional analysis is required because ... not every seizure constitutes custody for purposes of *Miranda.*" *Graham v. United States,* 950 A.2d 717, 728 (D.C.2008) (citations and internal quotation marks omitted).

In *Miranda,* the Supreme Court explained that "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way." 384 U.S. at 444, 86 S.Ct. 1602. This court has recognized, however, that

> [s]ince *Miranda,* the [Supreme] Court has narrowed the definition of custodial interrogation to include only those cases in which there has been a "formal arrest or restraint on freedom of movement *of the degree associated with a formal arrest.*" *California v. Beheler,* 463 U.S. 1121, 1125 [103 S.Ct. 3517, 77 L.Ed.2d 1275] (1983) (per curiam) (emphasis added and internal quotation marks omitted); *Berkemer v. McCarty,* 468 U.S. 420, 439–40 [104 S.Ct. 3138, 82 L.Ed.2d 317] (1984). Furthermore, this court has held that a restraint on liberty which would constitute a seizure under the doctrine of *Terry v. Ohio,* 392 U.S. 1 [88 S.Ct. 1868, 20 L.Ed.2d 889] (1968), does not necessarily place the seized person in custody for *Miranda* purposes. *McIlwain v. United States,* 568 A.2d 470, 472–73 (D.C.1989); *see Berkemer, supra,* 468 U.S. at 439–40 [104 S.Ct. 3138].

*E.A.H.,* 612 A.2d at 838 (footnote omitted); *see also Morris v. United States,* 728 A.2d 1210, 1216 (D.C.1999) (holding that even if a reasonable person would not have felt free to leave the police station to which Morris had been taken for questioning, and where he had been for more than four hours, and even if Morris had thus been detained, the restraint was not the equiva-

lent of a formal arrest, and Morris was not in custody for *Miranda* purposes when he made an incriminating admission). As we noted in *McIlwain*, "[t]he comparatively nonthreatening character of detentions [for a brief period to conduct investigations of suspicious circumstances, as permitted by *Terry* ] explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda*." 568 A.2d at 472 (quoting Justice Marshall's opinion for the Court in *Berkemer, supra,* 468 U.S. at 440, 104 S.Ct. 3138).

More recently, in *Bates v. United States,* 51 A.3d 501 (D.C.2012), we reiterated that

> *Miranda* warnings are required only when a suspect is subjected to custodial interrogation. That appellant was stopped for investigative purposes is not enough to establish that he was in custody for purposes of *Miranda,* even if a reasonable person would not have thought himself free to leave under the circumstances. Custody requires more than that—either a formal arrest or a restraint on freedom of movement to the degree associated with formal arrest.

*Id.* at 510 (footnotes, citations, and internal quotation marks omitted). Noting that "[a]ppellant was neither handcuffed nor physically restrained in any way, nor was he searched" prior to making the statement, we concluded that Bates "was not in custody for purposes of *Miranda.*" *Id.* at 511 (footnote and citation omitted).

In *In re M.E.B.,* 638 A.2d 1123, 1124 (D.C.1993), the police detained a juvenile respondent who was ultimately charged with murder. The officers told him that he was not under arrest, but they handcuffed him and transported him to another location fifteen blocks away for the purpose of conducting a show-up identification. *Id.* at 1125. The respondent confessed while he was so detained, and he subsequently claimed, as does A.J. in this case, that under these circumstances, his seizure and detention had been the practical equivalent of a custodial arrest without probable cause, and that his confession should therefore be suppressed. *Id.* at 1125–26. This court, however, rejected the respondent's contention on the basis of reasoning that also applies to the present case:

> Generally, an arrest is effected when the police have made a determination to charge the suspect with a criminal offense and custody is maintained to permit the arrestee to be formally charged and brought before the court. A *Terry* seizure, on the other hand, involves a more temporary detention, designed to last only until a preliminary investigation either generates probable cause or results in the release of the suspect.

*Id.* at 1126; *see also Womack v. United States,* 673 A.2d 603, 608 (D.C.1999) (quoting *In re M.E.B.*) Noting that "[t]here is no evidence that the officers meant to formally charge [M.E.B.] when they put [him] into the police vehicle," *M.E.B., supra,* 638 A.2d at 1126–27, we concluded that he was not in custody, and we upheld the trial court's refusal to grant the motion to suppress his confession.

To be sure, the question in *M.E.B.* was not identical to that presented here. That case turned on whether M.E.B. had been arrested in violation of the Fourth Amendment, while the issue in this case is whether A.J. was in custody for purposes of *Miranda,* a doctrine having its roots in the Fifth Amendment. *See generally In re I.J.,* 906 A.2d 249 (D.C.2006). In the Fifth Amendment *Miranda* context, the focus of that inquiry is on whether the detained individual could reasonably have perceived the police action as an arrest or its equivalent, and where, as here, the detainee is a child, his age must be taken into consideration in making that determination, al-

though the significance of his age varies from case to case. *J.D.B. v. North Carolina,* —— U.S. ——, 131 S.Ct. 2394, 2404–05, 180 L.Ed.2d 310 (2011).

We recognized in *I.J.* "that in many instances—perhaps most—a brief investigative *Terry* stop deemed reasonable under the Fourth Amendment will not trigger the protections of the Fifth Amendment," *id.* at 261. We declined, however, to adopt a bright line rule to the effect that *Miranda* warnings need never be given in any *Terry* stop case, without regard to how a reasonable person would view "the overall tenor of the situation." *Id.* at 260. We reiterated in *I.J.*, focusing on the perspective of the detained person, that he or she is in custody for Fifth Amendment purposes if, and presumably only if, he or she could reasonably believe "that his or her freedom has been restrained as in a formal arrest." *Id.* at 261. As the Supreme Court observed in *Berkemer,* 468 U.S. at 439–40, 104 S.Ct. 3138, and as we effectively recognized in *I.J.*, 906 A.2d at 261, this level of restraint is rarely present where a detention is brief and temporary, rather than an arrest. We are satisfied that in the present case, a reasonable person in A.J.'s position would not have believed that his liberty was restricted to the degree associated with a custodial arrest.

■ "The measure of the scope of permissible police action in any investigative stop depends on whether the police conduct was reasonable under the circumstances." *M.E.B.*, 638 A.2d at 1127 (citing *United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)). In deciding whether a particular detention constituted no more than a permissible *Terry* stop, the court must determine

"whether the officer's action was justified at its inception and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Sharpe,* 470 U.S. at 682, 105 S.Ct. 1568 (quoting *Terry,* 392 U.S. at 20, 88 S.Ct. 1868). If the answer to these questions is in the affirmative, then the detention amounts to a *Terry* stop rather than a custodial arrest, and ordinarily, no *Miranda* violation has occurred or is even "suggested." *See Berkemer,* 468 U.S. at 440, 104 S.Ct. 3138.

In this case, the uncontradicted evidence conclusively demonstrates that prior to the discovery of the weapon, A.J. was subjected only to a temporary investigative seizure designed to determine whether he was a truant. The initial detention was very brief. The officer did not tell A.J. that he was under arrest. On the contrary, he advised A.J. that he would drive him to the address that A.J. had provided, so that a parent would have the opportunity to corroborate A.J.'s explanation regarding why A.J. was not at school.[4] A.J. knew that his companion had been immediately released upon providing corroboration of his account, and he had no reason to doubt that he would be treated in the same manner. Unlike the respondent in *M.E.B.* and the defendant in *Womack,* who were both handcuffed and transported to another location, but who were nevertheless determined not to be under custodial arrest for Fourth Amendment purposes, A.J. was not handcuffed or otherwise restrained, nor did Officer Parsons accuse him of a crime. Indeed, beyond the bare fact of temporary seizure to transport A.J. to his home nearby for purposes of investigation, there is nothing that the officer did that could plausibly be perceived, from

---

4. The record does not disclose, and the officer did not know, whether A.J.'s explanation of

his absence from school—transportation problems—was true or false.

A.J.'s perspective or any other, as coercive, or as though he was being arrested. Although A.J. was indisputably detained, we conclude that he was not in custody for *Miranda* purposes when he answered Parsons' single question. Under these circumstances, and in light of the authorities that we have cited, *Miranda* has no application. We are therefore unable to agree with the trial judge's decision to order the suppression of A.J.'s statement, and, *a fortiori*, of the BB gun. *See Patane*, 542 U.S at 636–37, 124 S.Ct. 2620 (cited in footnote 1, *supra* ).

**B. The significance, if any, of the officer's suspicion that A.J. was a truant.**

A.J. was initially detained not because he was suspected of having committed a criminal offense, but rather because Officer Parsons believed that A.J. and his companion might be truants. A.J. claims, for two different and largely unrelated reasons, that this difference between the circumstances of the present case and those of a more typical temporary detention require us to rule that A.J.'s brief interrogation by Officer Parsons was unlawful. We address each of these contentions in turn.

**(1) The non-criminal character of truancy.**

■ A.J. asserts that truancy "is neither a felony nor a misdemeanor," and that "truancy is absent from Title 22, the Code's designated repository of criminal offenses and penalties." The Fourth Amendment, according to A.J., prohibits "any search under, in particular, an initial 'Terry stop,' when [there is] no articulable suspicion that the subject of the stop is involved in criminal activity." This contention, as A.J. implicitly concedes, is foreclosed by our precedents. In *In re W.R.*,

52 A.3d 820, 820–22 (D.C.2012), a case analogous to this one, we upheld the warrantless search of a juvenile who had been detained on suspicion of truancy, but who was not suspected of a crime. We stated that "[a]lthough W.R. was taken into custody for truancy, rather than a criminal offense, the search is valid 'because custodial seizures on any ground inherently pose a danger.' " *Id.* at 821 (quoting *In re J.O.R.*, 820 A.2d 546, 548 (D.C.2003)). We also rejected W.R.'s claim that "the District of Columbia's truancy scheme is unconstitutional because truancy is not a criminal felony or misdemeanor." *Id.* at n. 1. In *J.O.R.*, the principal precedent on which we relied in *W.R.*, and which contains a comprehensive discussion of analogous case law, we upheld the validity of a pat-down of a juvenile who was not charged with any offense, but who was detained on the basis of an outstanding child neglect custody order. 820 A.2d at 547–49.

The decisions in *W.R.* and *J.O.R.*, which are persuasive in any event, are binding on us under the doctrine of *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971). Accordingly, we conclude that neither the initial stop of A.J. nor the question posed to him by the officer was invalidated by the noncriminal nature of truancy.

**(2) The use of the word "custody" in the District's truancy statutes.**

■ Section 38–251 of the District of Columbia Code provides that a "law enforcement officer shall take *into custody* any child who the law enforcement officer has reasonable grounds to believe is a truant. . . ." D.C.Code § 38–251(a)(3) (emphasis added). Section 16–2309 likewise states that the police may "take[ ] *into custody* . . . [a] child . . . who is not in school . . . [but who] is of compulsory school age." D.C.Code § 16–2309(a)(7)

(emphasis added). The District acknowledges, and there can be no doubt, that A.J. was stopped and "taken into custody" in conformity with these provisions. A.J. contends, and the trial judge apparently believed, that in light of the use of the italicized language in these statutes, A.J. was in custody when he was questioned, and that he was therefore subjected to custodial interrogation in contravention of *Miranda.* We disagree. First, the use of the word "custody" in the quoted statutes was not designed to differentiate between detention and custody, a distinction that is critical to the analysis under *Miranda.* Second, the proper application of *Miranda* must be determined by constitutional principles rather than by local law.

Dictionaries can be useful in statutory construction, and while recognizing their limitations, we have noted that sometimes "it is useful to have one around." *Riggs Nat'l Bank v. District of Columbia,* 581 A.2d 1229, 1235 (D.C.1990). Nevertheless,

> "[w]ell before those of us who are today invoking his wisdom were born, one of this nation's most distinguished jurists wrote that statutes should be construed, not as theorems of Euclid, but with some imagination of the purposes which lie behind them." *Lehigh Valley Coal Co. v. Yensavage,* 218 F. 547, 553 (2d Cir.1914) (Learned Hand, J.), *cert. denied,* 235 U.S. 705, 35 S.Ct. 282, 59 L.Ed. 434 (1915). Earlier still, the highest court of this jurisdiction declared that "every statute must be construed with reference to the original intent and meaning of the makers, and which intent and meaning may be collected from the cause or necessity of the enactment, and the objects intended to be accomplished by it." *Ex parte Redmond,* 3 App. D.C. 317, 318 (1894).

*District of Columbia v. Jerry M.,* 717 A.2d 866, 872 (D.C.1998).

In this case, the purpose of the truancy legislation was to prescribe procedures for dealing with children who should apparently be at school but are not. Neither A.J. nor the trial judge has suggested anything to the contrary. In enacting the legislation, the Council of the District of Columbia had before it no issue regarding the circumstances under which a suspected truant is entitled to a *Miranda* warning. The Council's use of the word "custody" must be understood accordingly. Indeed, we think that the District's legislators would be surprised to learn that in enacting the truancy laws, they were believed to have taken a position on any *Miranda*-related issue. That simply is not a problem which these statutes were designed to address.

Moreover, A.J. relies in this case exclusively on *Miranda.* He does not claim, nor can he, that his position is supported by any ancillary local enactment relating to restrictions on the questioning of juveniles or of detainees generally. *Miranda* rights, however, are rooted in the Fifth Amendment, and they must be determined by resort to federal constitutional law, not to local law. *See generally Virginia v. Moore,* 553 U.S. 164, 174, 128 S.Ct. 1598, 170 L.Ed.2d 559 (2008).

### III.

### CONCLUSION

For the foregoing reasons, the decision of the Superior Court is reversed, and the case is remanded to that court with directions to deny A.J.'s motion to suppress and for further proceedings consistent with this opinion.

*So ordered.*